1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JESSECA NALDO,

4                    Plaintiff,              New York, N.Y.

5              v.                            15 Civ. 2896 (PKC)

6    GLAZE TERIYAKI, LLC, PAUL KRUG
     and DENNIS LAKE,
7
                    Defendants.
8
     ------------------------------x
9
                                            April 11, 2016
10                                          1:45 p.m.

11   Before:

12                    HON. P. KEVIN CASTEL,

13                                          District Judge

14                         APPEARANCES

15   PARDALIS & NOHAVICKA, LLP
          Attorneys for Plaintiff
16   BY:  ARIADNE PANAGOPOULOU
          JOSEPH D. NOHAVICKA
17
     HELBRAUN LEVEY & O'DONOGHUE LLP
18        Attorneys for Defendants
     BY:  KEVIN SEAN O'DONOGHUE
19        ROBERT ONTELL

20

21

22

23

24

25

 1                  (A jury of 8 impaneled and sworn)

 2            THE COURT:  Good afternoon, ladies and gentlemen.  For

 3   the record, is the jury satisfactory to the plaintiff?

 4            MS. PANAGOPOULOU:  Yes, your Honor.

 5            THE COURT:  Is the jury satisfactory to the defendant?

 6            MR. O'DONOGHUE:  Very much, your Honor.  Thank you.

 7            THE COURT:  Prior to the lunch break, I confirmed same

 8   with counsel and received the same response whereupon our

 9   jurors were duly sworn by the deputy clerk.

10            Let me give you some preliminary instructions, ladies

11   and gentlemen.  As I told you during the jury selection

12   process, the judge and jury have separate roles in a trial.  My

13   job is to instruct you as to the law that governs or controls

14   the case and I will give those instructions to you at the end

15   of the trial.  Your job as jurors is to determine the facts

16   based on the evidence presented at trial.  You are the triers

17   of fact and your decisions on the factual issues will determine

18   the outcome of this case.  You must pay close attention to all

19   the evidence presented.  Evidence consists only of the

20   testimony of witnesses, documents and other things admitted as

21   evidence, or stipulations agreed to by the parties.

22            Some things are not evidence and must not be

23   considered by you.  I'll list them now.  Statements, arguments,

24   and questions by lawyers are not evidence, nor are my own

25   statements to you.  So in a few moments the lawyers will make

1    an opening statement to you as to what they believe the

2    evidence will show and at the end of the trial they may give a

3    closing statement as to what they believe the evidence has

4    shown.  Those statements are their views on the evidence, but

5    they are not evidence themselves.

6         Same way with questions.  Say a lawyer stood up and

7    asked a witness, is it true that you went to Junior's

8    Restaurant in Brooklyn on April 3, 2011 and had lunch with Lady

9    Gaga.  Now, you are thinking, Junior's Restaurant, April, Lady

10   Gaga, there has got to be something to it.  If the answer to

11   the question is no, that's evidence of nothing.  If the answer

12   is yes, it's the question coupled with the answer that makes it

13   evidence.  So you don't read anything into the fact that a

14   question was asked.

15        And same way with my statements.  They don't qualify

16   as evidence.  Objections to questions are also not evidence.

17   Lawyers have obligations to their clients to make objections

18   when they believe evidence is offered improperly under the

19   rules of evidence.  You should not be influenced by the

20   objection or by the Court's ruling on it.  If the objection is

21   sustained, ignore the question and any answer that may have

22   been given.  If it is overruled, treat the answer like any

23   other matter.  If you are instructed that some item of evidence

24   is received for a limited purpose only, you must follow that

25   instruction.

1          During the course of the trial it's my job as the

2     trial judge to advise counsel whether they are not in

3     compliance with a rule of court.  That's what trial judges do.

4     I may tell somebody to stand back or to keep their voice up or

5     lower their voice or to do something in a particular manner.

6     Don't read anything into it.  I don't have any opinion as to

7     how you should decide this case.  I'm just doing my job as the

8     judge when I do that and counsel or direct an attorney.

9          Something else that's not evidence is testimony that

10     the Court has excluded or stricken or I told you to disregard.

11     It's not evidence and must not be considered by you.  Anything

12     you may have heard or seen outside the courtroom is not

13     evidence and must be disregarded.  You have to decide the case

14     solely on the evidence presented here in this courtroom.

15          Now, you will have to decide the credibility of the

16     witnesses.  You are going to observe them and watch them as you

17     do in your ordinary life and ask yourself questions like, did

18     they know what they were talking about?  Were they candid,

19     honest, open, and truthful?  Did they have a reason to falsify,

20     exaggerate, or distort their testimony?  Sometimes it's not

21     what a witness says, but the way that they say it that may give

22     you a clue as to whether or not to accept the witness' version

23     of an event.  In short, the way a witness testifies may play an

24     important part in reaching a judgment as to whether you can

25     accept the witness' testimony as reliable.

1            Now, you have to keep an open mind throughout the

2    trial.  A case can only be presented step by step, witness by

3    witness, and it would be unfair to one side or the other if you

4    made up your mind before you heard all the evidence.

5            Sometimes you hear a person give a version of an event

6    that sounds very impressive, compelling, and then you hear

7    another person's version of the same event or even the same

8    witness cross-examined with respect to the event and what

9    seemed so compelling and impressive isn't after you hear the

10   rest of the story.  What I'm saying is, remember there may be

11   another side to the story.  You'll use your common sense and

12   good judgment to evaluate the testimony based on all the

13   circumstances.

14           Now, there are a couple of rules I'm going to give

15   you.  First, do not discuss the case among yourselves or with

16   any other person.  I told you already today how important that

17   is.  That means you do not discuss it with spouses, significant

18   others, children, parents, anyone.  You'll be able to talk

19   about the case when it's over, but not now.  And, in fact,

20   you'll be able to discuss it among yourselves in the

21   deliberation process.  But you don't go back into the jury room

22   after a break and sit around the table and talk about what you

23   thought of a witness.  That's improper under the instructions

24   I've given you.  You do not discuss the case until the end of

25   the case and you're in deliberations.

1          Next, you are not allowed to permit anyone to speak to

2     you about the case.  If you are approached by anyone, and I'm

3     sure you will not be, politely tell them that the judge has

4     directed you not to speak to anyone.  If any person seeks to

5     contact you, you are required to report the incident to me

6     promptly.

7          If someone you know comes into the courtroom, and that

8     could happen, it's a public courtroom, let me know, pass a note

9     to my deputy, and she will pass it to me.  Because you are not

10    permitted to know what goes on in any of the sessions I have

11    with lawyers.  They relate to procedural matters and if there

12    is anything you need to know for the trial, I will see that you

13    know what you need to know.

14          The other thing is, you may not seek any information

15    about any aspect of the case by visiting the location or

16    searching on the Internet, or otherwise.  Obtaining information

17    about the case, either in person or through the Internet, would

18    be unfair to the parties.  I want you to think if you had a

19    family member who had a court case.  They would want the case

20    heard based on what came out in the courtroom.  They may have a

21    very good explanation for something.  But if you go off and you

22    do your own research and the case is decided on matters that

23    either plaintiff's counsel or defendants' counsel doesn't know

24    about, they don't have the opportunity to explain that that

25    isn't true, or it's not accurate or it's out-of-date

1    information or whatever it may be.  Just think of yourself or a

2    close family member sitting at these two tables and remember

3    how you would want to be treated.

4           You are not to read anything in the newspapers or the

5    Internet about the case, if that should occur -- I don't

6    believe it will occur -- and do not receive or send any

7    electronic communications about this case.  This includes no

8    texting, no e-mailing, no blogging, no posting on social

9    networks or websites or use of electronic communication to

10   discuss or even mention the case.  You don't even communicate

11   with one another during the trial about the case.

12          Let me say a few words about procedure.  In a moment

13   the lawyers will have an opportunity to make opening

14   statements.  That's a preview of what they believe the evidence

15   will be.  As I said, it's not evidence itself.  Then you will

16   hear the testimony of the witnesses.  The plaintiff's witnesses

17   go first.  Each witness gives direct testimony and then he or

18   she may be cross-examined by the other side.  Also, exhibits

19   and stipulations of fact may be received into evidence.  Then

20   the defendant can present witnesses and other evidence and

21   their witnesses can be cross-examined as well.  And then the

22   lawyers will have an opportunity to sum up.  The summations or

23   arguments are not evidence, and then you will receive my final

24   instructions on the law.

25          Without further ado, at this time I understand the

1   opening statement for the plaintiff will be delivered by Ms.

2   Panagopoulou, who is going to deliver it from the table.  Is

3   that what your preference is?  That's fine.

4              MS. PANAGOPOULOU:  Yes, your Honor.

5              THE COURT:  You may proceed.

6              MS. PANAGOPOULOU:  May it please the Court, counsel,

7   people of the jury, my name is Ariadne Panagopoulou and I

8   represent the plaintiff, Jesseca Naldo, in this action.  This

9   case is very simple.  Jesseca worked, was promised to be paid,

10  but she never was.  If there is one universal principle

11  underlying all employment laws in this country, it is this one.

12  Every worker deserves a fair day's pay for a fair day's work.

13  If you go to work, if you perform services for your boss, your

14  boss should pay you.  This is why we are here today.

15             For two and a half years Jesseca worked for her boss'

16  restaurant for more than 30 hours per week with no pay.  When

17  she asked to be paid on numerous occasions, they didn't pay

18  her.

19             During the course of this trial you will hear the

20  testimony of Jesseca, who will tell you how in February 2012

21  her bosses agreed to hire her to work in marketing and public

22  relations for the restaurant on a trial basis and agreed to

23  start paying her a few months later, when the business grew.

24  The evidence will show the extensive amount of work that

25  Jesseca performed, organizing events, reaching out to new

1    clients, responding to customer complaints, even cleaning

2    tables, taking out the garbage, and serving food, then

3    delivering it to people's homes.

4           The evidence will show e-mails and social media posts

5    of Jesseca interacting with clients and business partners,

6    people that depended on Jesseca for various tasks.  The

7    evidence will also show that Jesseca asked to be paid on

8    numerous occasions, both orally and in writing.  But their

9    reply was always the same:  Sure, let's talk about it.  Yeah.

10   When the business grows.  Well, guess what.  The business did

11   grow.  Three new locations opened while Jesseca worked there.

12   But she was never paid.

13          Now, this triggers a question.  Why did Jesseca

14   continue to work there for so long for free?  Because as the

15   evidence will show you, this young woman was full of passion

16   and ambition for her work and for her clients.  Because one of

17   her bosses misled her to believe on multiple occasions that

18   they eventually were going to pay her.  When they gave her a

19   few hundred dollars here and there to string her along, she

20   believed them, she trusted them, and she stayed.

21          The reality is that for two and a half years, from

22   February 2012 until August 2014, her bosses willingly accepted

23   her services but had no intention of ever paying her.

24          People of the jury, Jesseca worked hard.  It is time

25   that she is now compensated.  I am standing here today asking

 1    you to give Jesseca what her bosses never gave her, a fair

 2    day's pay for years of fair day's work.  Thank you.

 3            THE COURT:  Thank you very much.  Mr. O'Donoghue.

 4            MR. O'DONOGHUE:  May I use the same location as

 5    counsel?

 6            THE COURT:  You may.  Absolutely.

 7            MR. O'DONOGHUE:  Good afternoon.  My name is Kevin

 8    O'Donoghue.  I'm the attorney for Paul Krug, Dennis Lake, and

 9    their company, Glaze Teriyaki.  Along with Robert Ontell we

10    will be asking you to return a verdict in our favor, hopefully

11    at the end of today, perhaps tomorrow, depending on how this

12    goes.

13            An opening statement is supposed to be not argument,

14    like you just heard.  It's supposed to be a promise of what can

15    be proven with the evidence.  You've all seen CSI, SVU, what

16    have you, as evidence.  As the jury you see evidence, you

17    review it, and you make a decision about what you think

18    happened.  Simple.

19            In this case there is no evidence, or very little

20    evidence, that's going to show anything that counsel just told

21    you.

22            Now, she just made you a lot of big promises.  I'll

23    ask you at the end of this to think about all the things you

24    were just promised.  And when you have no evidence of that,

25    I'll ask you to give us a verdict, because there is no

1   evidence.

2          Counsel made a big statement, fundamental principle:

3   If you work, you get paid.  I think we can all agree on that.

4   If you work, you get paid.  If you are an employee, you get

5   paid.  Whether you are part time -- I'm sure some of you have

6   had part-time jobs -- or a 1099 as an independent contractor

7   perhaps, we understand these types of jobs.

8          And the judge at the end of the trial will tell you:

9   These are the things that makes an employee, these are the

10  things that makes an independent contractor.  There is

11  different classifications.

12         In any respect, in any area where you would be

13  employed, there would be proof, wouldn't there?  All of you

14  have jobs.  We heard all about you.  It was interesting.  But

15  you have jobs.  And in those jobs you can prove it.  If I said,

16  how do you know you worked for a golf course, you can say, I

17  have a pay stub; well, I pay my taxes and on my taxes it says

18  that I worked for the golf course.  And we all just discussed

19  your employment as well.

20         MR. NOHAVICKA:  Objection.  This is closing argument.

21         THE COURT:  Overruled.

22         Ladies and gentlemen, as I told you, opening

23  statements are a preview of what a lawyer believes the evidence

24  will show.  I'm giving both sides a little bit of latitude.  Go

25  ahead.

1        MR. O'DONOGHUE:  Thank you, your Honor.

2        THE COURT:  Ladies and gentlemen, if at the close of

3   the case, if you find that a statement made by a lawyer is not

4   supported by the evidence, then the lawyer's statement alone is

5   not proof of anything.

6        Go ahead, Mr. O'Donoghue.

7        MR. O'DONOGHUE:  Thank you, your Honor.

8        Nothing counsel said was evidence.  Nothing I say is

9   evidence.

10       THE COURT:  Move on, Mr. O'Donoghue.  I don't need a

11  repetition of my instruction to the jury.  Thank you very much

12  for reinforcing my comments, but move on.

13       MR. O'DONOGHUE:  Just trying to get my bearings back.

14       THE COURT:  Go ahead.  Do that.

15       MR. O'DONOGHUE:  There is proof of employment when one

16  is employed.  At the end of the year we all get a tax document,

17  says we are employed.  Every week or two weeks or every day we

18  get a pay stub, we get a direct deposit, we get some proof that

19  you worked.

20       In this case there is no evidence that Ms. Naldo, the

21  plaintiff, ever worked for Glaze Teriyaki.  Let's be clear.

22  The clients will testify about their business and they will

23  tell you, yeah, she came in, she worked for us briefly.  She

24  was from our hometown.  She was looking to build her résumé.

25  She was in college, she told us, full time, and she needed to

1    build up her résumé and we could use the extra help.  When we

2    needed a playlist of the music for the restaurant, when we

3    needed social media help, sure, we would let her do it.  But

4    she wasn't essential.  She wasn't an employee.  She wasn't

5    reliable.

6         You will hear from Ms. Naldo herself that she took

7    trips, that she was not always available, that she was in

8    school at St. John's.  This is not somebody who was an

9    employee.  This is somebody who every now and then did a little

10   bit of work and was compensated in different ways.  She was

11   given trips.  She was allowed to use her LinkedIn as a platform

12   to get more jobs.

13        She was allowed to try to develop herself, despite the

14   fact that she no degree in marketing and communications,

15   despite the fact that she had no experience whatsoever.  They

16   tried to help her out.

17        Subsequent to that time you will also hear from her,

18   she has never had a job in marketing.  She has never been able

19   to continue with this work.  The only thing she was able to do

20   was to help these guys out a little bit when they were gone.

21        Apparently, I didn't realize that as a company grows

22   it is supposed to pay people more.  That's not the way things

23   work.  These are two guys who are trying to get a business off

24   the ground, working day and night to get it done.  They had a

25   little bit of help from Ms. Naldo.

 1          What she is saying simply doesn't add up.  It doesn't

 2   add up.  30 months is what counsel told you, two and a half

 3   years.  30 months she worked there and she never got paid but

 4   she thought she would?  That doesn't add up.  The fact that

 5   when you see this evidence that they are going to show you,

 6   it's one e-mail, May 2013, where she brings up getting paid.

 7   How many of you would go 15 months working --

 8          MR. NOHAVICKA:  Objection.

 9          MR. O'DONOGHUE:  -- 30, 40 hours a week.

10          THE COURT:  Basis.

11          MR. NOHAVICKA:  Golden rule.

12          THE COURT:  What is the golden rule?

13          MR. NOHAVICKA:  When you address the jury --

14          MR. O'DONOGHUE:  A criminal thing, Judge.

15          MR. NOHAVICKA:  When you put the jury in your shoes.

16          THE COURT:  Overruled.

17          MR. O'DONOGHUE:  As I was saying, after 15 months you

18   say you are going to get paid and you are not.  I can

19   understand 15 days.  We have all had jobs where someone is late

20   paying you.  Sure.  15 months, 20 months, 24 months, 30 months?

21   That doesn't add up.

22          I am saying that what you are going to be shown today

23   is not going to add up to make you believe that there was an

24   employer/employee relationship here that required payment to

25   Ms. Naldo, and that's why all these years later you are sitting

1   here hopefully just for today.  There will be no evidence at

2   the end of this to show you that any of their claims are valid

3   and we will ask you, hopefully, to return a judgment in our

4   favor, for the defendants.  Thank you.

5          THE COURT:  Plaintiff may call their first witness.

6          MR. NOHAVICKA:  Thank you, your Honor.  We call

7   Jesseca Naldo to the stand, please.

8    JESSECA NALDO,

9        the Plaintiff, called as a witness on her own behalf,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. NOHAVICKA:

13   Q.  Jesseca, how old are you right now?

14   A.  27 years old.

15   Q.  Where do you live?

16   A.  I live in Long Island and go back and forth between Astoria

17   and Long Island.

18   Q.  That's Astoria, Queens?

19   A.  Yes.

20   Q.  I want you to tell the jury a little bit about your

21   educational background.  Where did you go to high school?

22   A.  I'm originally from Seattle, Washington.  I went to Holy

23   Names.  Sorry.  I'm a little nervous.  I went to -- I attended

24   St. John's in '07.  I was supposed to graduate in 2011, took a

25   little break.  Went like full time between working with Glaze,

 1   as well as going to classes.  I walked in and graduated a

 2   number of years ago but I never finished two classes, so that's

 3   what I'm doing right now, is to complete that.

 4   Q.  What kind of degree did you get?

 5   A.  Communications.

 6   Q.  Did you take any classes in marketing while you were in

 7   school?

 8   A.  I did.

 9   Q.  What classes did you take?

10   A.  Copyrighting class, graphic designs class, intro to mass

11   communications, those types of classes, public relations.

12   Q.  Did you get any kind of awards or anything while you were

13   at St. John's?

14   A.  I was very involved in student government and some other

15   clubs, so I guess that's my -- I did get a couple of awards.

16   Q.  Were any of them related to marketing?

17           MR. O'DONOGHUE:  Objection.  Leading.

18           THE COURT:  Overruled.

19   Q.  Were any of the clubs that you were involved in related to

20   marketing?

21   A.  Yes.

22   Q.  What were they?

23   A.  Well, I was on student government.  I was working on a

24   committee, concert committee, public relations committees, got

25   a lot of awards -- not me solely, but our team and especially

1  when I left and distanced myself from student government.  We

2  did get recognized.

3  Q.  Let's talk a little bit about your employment background.

4  Tell us what you did when you first -- not when you first

5  graduated, but after high school, what did you do?

6  A.  My first job was working as a hostess at Top of the Rock,

7  the attraction at Rockefeller Center.  I did a couple of

8  internships, PR internship.  I did an internship with the one

9  group, the restaurant hospitality group.  They specialize --

10          THE COURT:  Excuse me.  Stop.  Specialize in.

11          THE WITNESS:  Restaurant hospitality.

12  Q.  When did you do that?

13  A.  I did that right before my position with Glaze, so that was

14  my internship prior.

15  Q.  And what other experiences have you had with marketing

16  prior to going to Glaze?

17  A.  I used to work for Red Bull North America.  I was a part of

18  their brand representative marketing team.  We did a lot of

19  gorilla marketing, experience shall marketing.  I worked a lot

20  with events, a lot with branding.

21          THE COURT:  Slow down.

22  A.  A lot with branding.

23  Q.  It's exciting, but you have to slow down.

24  A.  Beverages.  That was my experience with that.  We worked

25  within a team.

1   Q.   How long did you work with them?  This is with Red Bull we

2   are talking about.

3   A.   About two years.

4   Q.   Did you get paid during that time?

5   A.   I did.

6   Q.   You were considered an intern, you testified, is that

7   correct?

8   A.   I'm sorry?

9   Q.   You testified that you were an intern?

10  A.   Yes.  With the ONE Group.

11  Q.   After Red Bull, what is the next thing you did?

12  A.   After Red Bull, I became an administrative assistant for a

13  ballroom dance studio.  That was my summer job.  And then,

14  after that, was my internship with the ONE Group.

15  Q.   When was the internship with the ONE Group, what year?

16  A.   2011.  The latter half.

17  Q.   And I am going to talk to you now about your time with

18  Glaze Teriyaki.  First of all, please tell the jury, what Glaze

19  Teriyaki is.

20  A.   Glaze Teriyaki is a fast casual restaurant specializing in

21  Seattle style teriyaki platters, so rice, entrée, sides, very

22  fast, very casual.  I just said that.

23  Q.   When did you start working there?

24  A.   February 2012 is when I signed on board.

25  Q.   Where is it located?  I'm talking about the Glaze Teriyaki

 1   where you were working.

 2           MR. O'DONOGHUE:  Objection.  Counsel continues to say

 3   working, which has not yet been established.

 4           THE COURT:  Overruled.

 5   Q.  You want me to repeat that?

 6   A.  Yes.

 7   Q.  Where was the Glaze Teriyaki restaurant where you were

 8   working --

 9   A.  Midtown East.

10   Q.  Where exactly is midtown East?

11   A.  53rd and Lexington.

12   Q.  How is it that you became aware of an opening there?

13   A.  I subscribe to newsletters, like Gothamist, and they

14   continually announce new restaurants, and I had gotten a

15   notification about a new Seattle-style teriyaki place and it's

16   something that we hold dearly back home.  It's like our street

17   food, our mom-and-pop thing.

18           While I was in school, it was actually an idea that I

19   really wanted to do for myself.  I thought it was something

20   that New York didn't have, which was teriyaki, which was

21   unconventional, different.

22           But I realized someone else had already started it,

23   and I wanted to kind of check it out for myself, it was a

24   comfort thing, a home thing.  I went to the restaurant on a

25   random visit and that's where I met Paul.

 1   Q.   When you are referring to Paul, who is that exactly?

 2   A.   The operator and owner.

 3   Q.   What is his last name?

 4   A.   Krug.

 5   Q.   Is he here in this courtroom today?

 6   A.   He is.

 7   Q.   Can you point to him and identify him.

 8           THE COURT:  Tell me an article of clothing he is

 9   wearing.

10           THE WITNESS:  Maroon tie, suit.

11           THE COURT:  Which table, the front table --

12           THE WITNESS:  The second table.

13           THE COURT:  On the right-hand side of the table or the

14   left-hand side of the table?

15           THE WITNESS:  Left-hand side of the table.

16           THE COURT:  Identification noted.

17   Q.   And when did you first meet with that gentleman?

18   A.   I went into the restaurant and I had --

19   Q.   Let me just interrupt you.  My question for the jury to

20   hear is, when did this occur?

21   A.   When?

22   Q.   Yes.

23   A.   October 2011.

24   Q.   And how is it that you made an appointment?

25   A.   I didn't make an appointment.  I walked in, ordered my

 1   food, introduced myself to the cashier.  I got really excited.

 2   I was like, are you from Seattle?  And he said no.  But he

 3   went, I'm not from Seattle, but that guy back there, and that

 4   guy back there was Paul.  And then once I got my food, I sat

 5   down by myself and he came over to say hi because he got the

 6   news, and that's --

 7   Q.  Let me just stop you.  I didn't mean to step on your words.

 8           MR. O'DONOGHUE:  Objection.

 9   Q.  What news are you talking about?

10           MR. O'DONOGHUE:  Objection.  Counsel can't stop his

11   own witness amid testimony and then ask her to give an answer

12   that he wants differently.

13           THE COURT:  I would avoid doing that, please.

14           MR. NOHAVICKA:  Very well, your Honor.

15   A.  Repeat, please.

16   Q.  We were talking about you in the restaurant when you told

17   us that you ordered your food.

18   A.  Yes.

19   Q.  At some point you got over to meet with Paul?

20   A.  Um-hum.

21   Q.  Is that accurate?

22   A.  Yes.

23   Q.  What did you say to him?

24   A.  He came over, and I don't know the exact verbiage, but he

25   was like, you're from Seattle.  And that's where we kicked off.

1    And I think we just had a very casual conversation, you know

2    about teriyaki.  I do.  Love it.  He asked me what I thought

3    about the product.  I said it was phenomenal, tasted like home.

4    Just a really great conversation.

5         I told him about how I was interning for the ONE Group

6    and that is what I was doing, but something like what he was

7    doing was actually a concept that I was really passionate about

8    and he admired that.  And then from there we exchanged

9    information and agreed on possibly meeting for coffee to

10   discuss my potential future with Glaze.

11   Q.  During that first conversation, did you discuss at all what

12   you were doing for the ONE Group?

13   A.  Yes.

14   Q.  What did you tell him exactly?

15   A.  I said I was a marketing intern/assistant for the ONE

16   Group, and I was assisting with events, I was helping out with

17   their social media and marketing efforts.  He was really

18   interested because I was young and clearly experienced and that

19   sort of stuff, and, plus, I was also passionate about the

20   concept.  I understood it.  It's a weird concept, but not a lot

21   of people can understand or embrace.  And me being from

22   Seattle, he liked that.

23   Q.  Did he ask you about any other experience you had in

24   marketing?

25   A.  Yeah.  I mentioned Red Bull, I mentioned -- I think Red

1    Bull was the big one.  But being a marketing assistant already

2    from a restaurant background and a hospitality background, that

3    helped a lot.

4           THE COURT:  And this conversation was when?

5           THE WITNESS:  October 2011.

6           THE COURT:  Thank you.

7    Q.  After the October 2011 initial meeting that you had with

8    Paul, did you have a second meeting?

9    A.  We did.

10   Q.  And when was that?

11   A.  I'm not sure exactly.  It was November or December 2011.

12   And we met for coffee.

13   Q.  Where did it take place?

14   A.  I think coffee.

15   Q.  Where is that?

16   A.  That was on 13th and Fourth.

17   Q.  Who arranged that location?

18   A.  Paul did.

19   Q.  And you went to that location?

20   A.  Um-hum.

21   Q.  Yes?

22   A.  Yes.

23   Q.  Were you by yourself?

24   A.  Yes.

25   Q.  And was he with anybody else?

1   A.   It was just the two of us.

2   Q.   What did you discuss?

3   A.   We discussed -- we just kind of continued off of our last

4   conversation.  He was really interested in me coming on board.

5   He talked about me interning for him.  He said that it wouldn't

6   be paid, but over time and over a few months, once the business

7   grew, that we would consider compensation once I was more

8   settled in my position and helping out.  We would talk about

9   money.  I think for me I really wanted to be a part of that

10  cause and that concept and for me it was ok for a few months.

11  I thought, let's do this.  It was something I really wanted to

12  do.

13  Q.   At that time what was your understanding of an internship?

14  A.   My understanding was that there was an educational aspect

15  to it.  So I would shadow him to meetings, to site visits, just

16  kind of learn his side of being a restaurant operator, and

17  especially with a start-up restaurant coming off the ground I

18  knew it was a great opportunity to experience that first hand

19  as well as assisting him on the marketing strategy side of

20  things, especially since I'm a college student.  I know social

21  media.  And he knew that I could do that well and I could

22  perform that well and be creative and get those things done.

23  Q.   At this coffee shop meeting was there discussion about what

24  your duties would be upon your start date at Glaze Teriyaki?

25  A.   Not specifically.  It was more so me just shadowing him, me

1    more so just following him around and learning.  And in terms

2    of specific tasks, those weren't really, I guess, discussed

3    until I started my first few days there when we kind of

4    realized, this is what needs work, this is what's missing, this

5    is what could be improved upon.  I think from there that's when

6    we started to gain ground on my involvement and find things for

7    me to do.

8    Q.  At this time that you were at the coffee shop with Paul,

9    were you a student in college?

10   A.  I'm sorry?

11   Q.  Yes.  At the time you were with Paul at the coffee shop

12   meeting, were you a student in college?

13   A.  Yes.

14   Q.  And what year were you in?

15   A.  My senior -- it should have been my senior year.

16   Q.  Where was that?

17   A.  St. John's.

18   Q.  When Paul discussed with you compensation, you mentioned

19   that word compensation, what was your understanding of what

20   compensation was?

21          MR. O'DONOGHUE:  Objection.  Mischaracterizes the

22   testimony and calls for an answer that the witness cannot give.

23          THE COURT:  I'll allow it.  Go ahead.

24   Q.  You want me to repeat that for you?

25   A.  Yes.

1  Q.  When the word compensation was discussed at the meeting

2  with Paul, what was your understanding of the meaning of that

3  word?

4  A.  Money.

5  Q.  Were college credits offered to you at that time?

6  A.  No.

7  Q.  Did you receive college credits during any time that you

8  worked for Glaze Teriyaki?

9  A.  No.

10          MR. O'DONOGHUE:  Objection.  Counsel continues to lead

11  the witness, Judge.

12          THE COURT:  Yeah.  Avoid that.

13          When you say offered, offered by whom?

14          MR. NOHAVICKA:  By Paul, your Honor.  I'm sorry, that

15  wasn't clear.

16          THE COURT:  The question is whether the defendant

17  offered college credit?

18          MR. NOHAVICKA:  Yes.

19          THE COURT:  How would the defendant offer college

20  credit?

21          MR. NOHAVICKA:  Just like at our firm, we have interns

22  that in addition to getting paid, they also get credits --

23          THE COURT:  They may.  But you don't offer any credit.

24  You are not authorized to offer any credit, are you?

25          MR. NOHAVICKA:  At my firm I am, yes.

```
 1              THE COURT:  Really.  I stand corrected.  I have never
 2    heard of it before.  Next question.
 3              The question is, did either of the defendants offer
 4    you college credit?
 5              THE WITNESS:  No, they did not.
 6    Q.  From the time that you had that meeting at the coffee shop,
 7    how much time passed before you actually started working at
 8    Glaze Teriyaki?
 9    A.  A couple of months.  By November, December, January I
10    started to be wary.
11    Q.  What was the approximate date that you started with Glaze
12    Teriyaki?
13    A.  Beginning of February 2012, somewhere in the first week.
14    Q.  I want you to explain to the jury, on your first day, what
15    were your duties at Glaze Teriyaki?
16    A.  I honestly don't remember.  It's been such a long time.
17    But I remember walking in the door and just getting a tour,
18    being introduced to everyone, seeing the storage, kind of
19    seeing how everything worked in the kitchen.  And I think my
20    first day was more so watch how this kitchen operates, watch
21    how they work together, explore, get yourself familiar, and
22    kind of just see -- he wanted my opinion and my feedback on
23    what we could improve upon in terms of marketing, what we could
24    put around the restaurant, the chalkboards, on the front
25    window, the menus, things like that.
```

 1          THE COURT:  When you came in on that first day, were
 2   you asked to do anything?
 3          THE WITNESS:  Not that I recall.
 4          THE COURT:  Next question.
 5   Q.  When was the first time you were asked by anybody at Glaze
 6   Teriyaki to start actually doing something when you came there
 7   for work?
 8          MR. O'DONOGHUE:  Objection to form.
 9          THE COURT:  Try and rephrase it, please.
10   Q.  When did you start performing any kind of duties at Glaze
11   Teriyaki?
12   A.  That first week or second week.
13   Q.  We want you to tell us what it is that you did.
14   A.  I don't remember.  It most likely had something to do with
15   customer relations, responding to a customer complaint or
16   sending out gift cards, possibly administrative work, archiving
17   things, storage, keeping track.  That's what I can remember.
18   It was fairly simple stuff.
19   Q.  Were you given any instruction by anybody at Glaze Teriyaki
20   as to what your duties would be?
21          MR. O'DONOGHUE:  Objection to form.
22          THE COURT:  Overruled.
23   Q.  You want me to ask it again?
24   A.  Yes.
25   Q.  Did anyone ever give you instructions on what your duties

1    were at Glaze Teriyaki?

2    A.  No.

3    Q.  And when did you start performing any duties other than

4    what you just described to us?

5    A.  I guess a few months into -- not even.  I think a couple of

6    months into it.  We started doing more catering efforts.

7            THE COURT:  Never mind we.  State what you did or what

8    you were asked to do.  Leave we out of it.  Ok.

9            THE WITNESS:  Ok.

10           THE COURT:  Thank you.

11   A.  Could you repeat that one more time.

12   Q.  Yes.  We were talking about what your duties were and what

13   actual duties you were doing.

14   A.  So in addition to me shadowing Paul and following him

15   around and doing some light marketing work, a couple of months

16   into it, I started to gain more responsibility with Dennis.  So

17   he wanted me to get involved with -- because I really wanted to

18   put more into my position at Glaze.  There were catering

19   efforts, how to reach out to clients, how to reach out to

20   potential customers and how to get out there and put our name

21   out there.

22           THE COURT:  I've lost the train of thought here.  Is

23   this something you asked to do?  Is this something you were

24   told to do?  Please give me your best recollection of what

25   transpired.

 1              THE WITNESS:  Both, actually.  It was -- as an intern,

 2      as someone who really wanted to do well at their job, whatever

 3      the description was --

 4              THE COURT:  Confine yourself to what transpired, not

 5      your state of mind, not what you are thinking, but what was

 6      said to you and what you said and what you did.

 7              Why don't you put a fresh question to the witness.

 8      Q.  We were talking about your duties and you mentioned

 9      increased responsibilities for Dennis, is that correct?

10      A.  Yes.

11      Q.  What do you mean by responsibilities?

12      A.  Well, once I started -- they wanted me to start learning

13      about how the restaurant was ran and how things behind the

14      scenes --

15              THE COURT:  Who is they?

16              THE WITNESS:  Paul and Dennis.

17      A.  So that was part of me learning the restaurant and me

18      learning Glaze was, you should learn how to work the cashier.

19      You should learn how to pack the food to go.  You should learn

20      how to deliver the food.  Because this is important to your

21      position, even though my position ideally was to focus on

22      marketing.  But because I wanted to learn everything about the

23      restaurant, I was ok with that for the time being, catering,

24      light event work.  All of that together, that's -- over time

25      the responsibilities were added, but it all kind of branched

1   out from there.

2   Q.  And when they said you should learn how to do the cashier,

3   what happened after they said that?

4   A.  After they said that and after I had learned the basics of

5   it, they kind of assumed that I would substitute for a cashier

6   or I would be an additional cashier girl, especially during our

7   lunch rushes or packing that food to go.

8   Q.  Did you work the cash register?

9   A.  I did.

10  Q.  How often?

11  A.  Quite often.

12  Q.  And with the other aspects of this that you should learn,

13  did you actually take over those responsibilities?

14  A.  I did, when necessary.

15  Q.  Example.  Of what?  Like what?  Cashier, you said.  You

16  were a cashier.  What other things?

17  A.  I was a cashier.  If the garbage needed to be taken out, I

18  would take it out.  If the tables need to be clean, if there

19  needed to be extra supplies, I would run down to Bowery and go

20  get them.  I ran a lot of errands.  I did a lot of quality

21  control in the restaurant just to make sure everything was of

22  the highest standard.  I think my position, even though I

23  wasn't an official cashier girl, I had the mind-set --

24          THE COURT:  Never mind the mind-set.

25  Q.  Were there any other things other than what you just

1   mentioned now, actual physical things, dishes, anything like

2   that?

3              MR. O'DONOGHUE:  Objection to leading.

4              THE COURT:  Avoid leading.

5              (Continued on next page)

 1           MR. NOHAVICKA:  Yes, your Honor, I'll ask again.

 2  BY MR. NOHAVICKA:

 3  Q.  Were there any other duties that you performed while you

 4  were at Teriyaki?

 5  A.  Delivery.

 6  Q.  You did the delivery?

 7  A.  I did do delivery every once in a while.

 8  Q.  How often is every once in a while?

 9  A.  Once or twice a week.

10  Q.  What were your hours when you first started working at

11  Glaze Teriyaki?

12  A.  My hours when I first started working, since I was working

13  part time, it was like 20 to 25, at most 30 hours.  When I

14  didn't have class I would show up.

15  Q.  And were there times when you worked more than 30 hours a

16  week?

17  A.  Yes.

18  Q.  When were those times?

19  A.  Those were probably after the initial internship period, so

20  after the first few months.  And especially when I started

21  getting more responsibility, getting more accountability,

22  that's when I started to commit more hours.  I came in, even

23  the days I had classes, I would come in right after class,

24  sometimes on the weekends as well.

25           THE COURT:  So when was that?

 1          THE WITNESS:  After I would say after June or

 2   July 2012, once school -- especially once school concluded for

 3   the summer.

 4   Q.  Could you explain to the Court, from your first year at

 5   working at Glaze Terry, what the hierarchy of management was at

 6   the midtown restaurant?

 7   A.  You had your employees, so cashier or host, and then the

 8   kitchen.  But in terms of hierarchy of position, you had Paul

 9   and Dennis, and that was it, and I was right below them.

10   Q.  So were you part of the management or the lower part?

11   A.  I'm not really -- in terms of management, you mean Paul and

12   Dennis?

13   Q.  Yes.

14   A.  To be honest, not in the beginning, but over time, yes.

15   Q.  Yes?

16   A.  Management.

17   Q.  Management.  Okay.  I'm going to show you right now what

18   has been marked for identification as Plaintiff's Exhibit 1.

19          MR. NOHAVICKA:  Your Honor, that's in Tab Number 1 in

20   the binder.

21   Q.  And Jessica, you have Number 1 right in front of you.  And

22   I just want you to take a look at that document, and can you

23   tell me what that document is?

24   A.  It's my LinkedIn profile.

25   Q.  Does it describe the time that you were at Glaze Teriyaki

 1   and going backwards?

 2   A.  It does.

 3   Q.  And you prepared all this information on there?

 4   A.  Yes.

 5   Q.  And to this day, does it look like this now?

 6   A.  If it wasn't deleted.

 7   Q.  But at the time that you were at Glaze Teriyaki, that you

 8   were working there?

 9   A.  Yes.

10          MR. NOHAVICKA:  Your Honor, I offer this document as

11   Plaintiff's Exhibit 1.

12          THE COURT:  Any objection?

13          MR. O'DONOGHUE:  Yes, objection and voir dire, your

14   Honor.

15          THE COURT:  Go right ahead.

16          MR. NOHAVICKA:  Your Honor, may I be heard on that?

17   According to joint pretrial order, there's no objection to this

18   document.

19          THE COURT:  Is that correct?

20          MR. O'DONOGHUE:  The document has substantially

21   changed since that time, your Honor.

22          MR. NOHAVICKA:  It's the only document that we ever

23   had.

24          THE COURT:  I will allow the voir dire.

25          MR. O'DONOGHUE:  Thank you, Judge.

1   BY MR. O'DONOGHUE:

2   Q.  Good afternoon, Ms. Naldo.

3           As you know, my name is Kevin O'Donoghue.  We met

4   before.

5           THE COURT:  Ask the question.

6           MR. O'DONOGHUE:  Yes, Judge.

7   BY MR. O'DONOGHUE:

8   Q.  Ms. Naldo, the document in front of you has a date stamp on

9   it, does it not?

10  A.  It does.

11  Q.  What is that date, please?

12  A.  For intern or for --

13  Q.  No, at the top where it was printed out.

14  A.  July 2012 to August 2014.

15  Q.  I'm referring to the date at the top left corner.  Do you

16  see that?

17  A.  January 12, 2016.

18  Q.  Isn't it true since January 12, 2016 you made changes to

19  this document?

20  A.  Potentially, yes.

21  Q.  Ma'am, I'm asking you --

22          THE COURT:  Excuse me a second.  Do you recall whether

23  you made changes to the document since January 12, 2016?

24          THE WITNESS:  Yes, I update my LinkedIn.

25  Q.  So what your attorney gave you to look at is not what is

 1   actually on LinkedIn right now, isn't that true?  You deleted a

 2   lot of information that was on there in January 2012.

 3   A.  Can I explain?

 4          My LinkedIn -- this is the second time my LinkedIn has

 5   been -- I have that one position, integrated marketing and

 6   brand manager, and for the second time it disappeared.  The

 7   intern stayed, but the second time it disappeared, so I had to

 8   replace it with what I had before.  And I couldn't find this

 9   updated version from January 12, I could only find something

10   that was before that, so it's not -- I'm not changing it.

11   Q.  Did you update it or not?

12   A.  Sorry?

13   Q.  You said you --

14   A.  I did, because it disappeared.

15   Q.  And it would be true, then, that what is before you is not

16   what is actually there now, correct?

17   A.  I don't know.  I honestly don't know.

18   Q.  This document that you created and you said you wrote all

19   this, integrated marketing and brand manager, did you create

20   that title?

21   A.  Yes.

22   Q.  You were never given that title by anybody?

23   A.  No.

24          MR. O'DONOGHUE:  Your Honor, I renew my objection to

25   this document as it is not the same document that currently

 1   exists on LinkedIn.  In other words, it's inauthentic.

 2            THE COURT:  Do you have a follow-up question you want

 3   to ask?

 4            MR. NOHAVICKA:  With respect to voir dire, no, your

 5   Honor.  I believe I asked all the questions for our foundation,

 6   which was basically that this is the document that was in

 7   effect at the time that she was at Glaze Teriyaki.

 8            THE COURT:  Let me see you both at sidebar for a

 9   minute.

10            Ladies and gentlemen, you can stand up and stretch.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At sidebar)

2              THE COURT:  Am I correct there's no objection except

3    for a foundation objection?

4              MR. O'DONOGHUE:  It's foundational, and it's not

5    accurate.  She had to revise it substantially.  So they took a

6    version that they liked from back in the day, but it's not the

7    current version.

8              THE COURT:  Here's the problem:  I would readily

9    sustain an objection to this document as an out-of-court

10   statement offered for the truth of its content.  It's

11   self-serving --

12             MR. O'DONOGHUE:  It is.

13             THE COURT:  Excuse me, a second.  I don't need you to

14   chime in on my rulings, Mr. O'Donoghue, do you understand?

15             MR. O'DONOGHUE:  Yes, Judge.

16             THE COURT:  So if you like what I'm saying, don't

17   start yessing me.  You got that?

18             MR. O'DONOGHUE:  Yes, Judge.

19             THE COURT:  White noise, Flo, please.

20             But if the only objection is foundational, and all you

21   are offering it as the LinkedIn profile that was as of

22   January 12, 2016 --

23             MR. NOHAVICKA:  Not --

24             THE COURT:  What are you offering it as?

25             MR. NOHAVICKA:  This was the version that was online

1   at the time that she was at Glaze Teriyaki.

2          THE COURT:  I didn't hear that established.

3          MR. NOHAVICKA:  I asked her.

4          THE COURT:  I didn't hear that established.

5          MR. NOHAVICKA:  I'm sorry, Judge.

6          THE COURT:  That's why I asked you that.  You may

7   have, but I didn't hear that and I don't recall that.  But if

8   she adopts it, that's what you're offering it as, how was it

9   identified on your exhibit list, by the Bates number?

10          MR. NOHAVICKA:  Yes, Exhibit 1, and it's the first

11  exhibit and also Bates 1.

12          MR. O'DONOGHUE:  My objection, Judge, was twofold.

13  Number one, it is not an authentic true and accurate version of

14  a document that exists today.

15          Number two, as I stated --

16          THE COURT:  Who says it has to be a true and

17  accurate --

18          MR. O'DONOGHUE:  I have a print-out from today.

19          THE COURT:  Excuse me, who says it has to be a true

20  and accurate copy of a document that exists today?

21          MR. O'DONOGHUE:  It's being offered as proof of the

22  fact that this is essentially her online résumé.  What I'm

23  saying is it's inauthentic.

24          THE COURT:  I didn't hear that.  He just said

25  something very different.

1                MR. O'DONOGHUE:  Well then, your Honor --

2                THE COURT:  Excuse me.  You said something different.

3     It's not being offered as her --

4                MR. NOHAVICKA:  Not her current résumé.

5                MR. O'DONOGHUE:  Your Honor, this is a document that

6     she just testified not only did she create on her own, so it's

7     a self-serving document, she also testified just now that she

8     created the title.  She was never even given that title.  She

9     further testified that she had to revise it basically it's

10    inaccurate information.  So what they're offering this to the

11    jury as is proof that she had this job and this title, and I'm

12    saying that's misleading to the jury as evidence and it's

13    improper, inauthentic evidence for a jury.

14               THE COURT:  Now, listen, if you have a foundation

15    objection, your foundation objection is that it isn't in fact

16    what the witness said it is, I suppose.  The witness said -- if

17    the witness said, and I will make you establish that this is

18    what she maintains is the online résumé while she worked at

19    Glaze Teriyaki --

20               MR. NOHAVICKA:  Yes, your Honor.

21               THE COURT:  -- I'm telling you I would in a heartbeat

22    sustain an objection to this document if it's an online résumé

23    from when she worked there.  But the only objection you have

24    raised is a foundation objection, and she will have laid the

25    foundation.

 1          MR. O'DONOGHUE:  Your Honor, I made two specific

 2   objections, foundational and as to authenticity as to the

 3   document itself because it's inauthentic.  It's a hearsay

 4   document.

 5          THE COURT:  Hearsay -- is that correct, that he

 6   objected on hearsay grounds?  Because I will sustain it if you

 7   did.

 8          MR. O'DONOGHUE:  I did on voir dire.  Inauthentic is a

 9   hearsay objection.

10          THE COURT:  No, it's not, sir.

11          MR. O'DONOGHUE:  I make that objection, now, your

12   Honor.

13          THE COURT:  The question here is I was represented a

14   moment ago by plaintiff's counsel that you didn't object in

15   your joint pretrial order.  Was that untrue?

16          MR. O'DONOGHUE:  Your Honor, the joint pretrial order

17   were documents that each party intended to include.  They

18   weren't fully marked or else we wouldn't be going through a

19   foundation process right now.  These are documents that may be

20   offered at trial as exhibits, they were not agreed to and

21   stipulated on as exhibits.

22          THE COURT:  That's not what I asked you.  That's not

23   what the joint pretrial procedure provides for.

24          Listen, I don't need to do this with a jury here.  Go

25   back and read the rules for the joint pretrial order.  The

 1    question is whether you objected and the ground that you

 2    objected on.  Did you object to the document?

 3              MR. O'DONOGHUE:  No, I'm objecting now.

 4              THE COURT:  Okay.  If you had objected in the joint

 5    pretrial order, I would now would be sustaining your objection.

 6    Why shouldn't I deem your objection waived for the absence of

 7    it in the joint pretrial order?

 8              MR. O'DONOGHUE:  Because it was made on record, it was

 9    made in voir dire, and it's clearly misleading to the jury.

10              THE COURT:  You're not understanding me.

11              MR. O'DONOGHUE:  I am understanding.

12              THE COURT:  I don't think you are.  In other words,

13    the joint pretrial order process has no moment, because if you

14    don't object in the joint pretrial order but you object at

15    trial, the objection at trial supersedes the absence of the

16    objection in the joint pretrial order.  That's what you're

17    urging upon me, and that's not law.

18              MR. O'DONOGHUE:  There's no way to know if they would

19    actually offer something at trial until they do.  Very

20    frequently things go into the exhibit list and the pretrial

21    order that never actually make it before the Court.

22              THE COURT:  Very true.  Go back and look at the rules,

23    and if you have an objection -- that's true, not everything

24    that's on the exhibit list gets offered.  You were given an

25    opportunity -- you're required to list it, and you're given an

1   opportunity to object.

2              MR. O'DONOGHUE:  I may have objected.  I don't have it

3   in front of me.

4              THE COURT:  You should look at it.  If you properly

5   objected, I sustain your objection.  If you didn't, it's

6   overruled.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (In open court)

 2                  THE COURT:  Appears to be page 5, Roman Numeral 9.

 3                  You may ask your foundational question.

 4      BY MR. NOHAVICKA:

 5      Q.  Jessica, the document that you're looking at right now that

 6      you identified as the LinkedIn page, forgive me if I asked you

 7      this, was this how your document looked -- was this how the Web

 8      page looked while you were working at Glaze Teriyaki?

 9      A.  No.

10                  THE COURT:  Sustained.

11                  MR. O'DONOGHUE:  Thank you, Judge.

12                  THE COURT:  Next question.

13      Q.  You heard counsel mention integrated marketing and brand

14      manager, and you said that you created that.

15      A.  I did create it, yes.

16      Q.  And what does it mean exactly?

17      A.  Integrated marketing is basically a combination of all the

18      various types of marketing and different functions with public

19      relations, sales promotion, experiential, guerilla, social

20      networking.  I did it at all, and it all falls under the

21      umbrella integrated marketing and utilizing different

22      strategies, different platforms, doing all of these things in

23      order to complement each other and complement the brand

24      strategy.

25      Q.  And was that specific title on your LinkedIn page at the
```

1    time you worked -- just that title, was that on your LinkedIn

2    page at the time you worked at Glaze?

3    A.  Yes.

4              MR. O'DONOGHUE:  Objection, leading question.

5              THE COURT:  Rephrase it and avoid leading.

6    Q.  Did you indicate anywhere online that you had this

7    integrated marketing and brand manager position?

8              MR. O'DONOGHUE:  Objection, leading question.

9              THE COURT:  Sustained.

10   Q.  At the time you worked at the Glaze Teriyaki, what did you

11   represent yourself to be online?

12   A.  Marketing and brand development.

13   Q.  And that's the name that you -- that was the name that you

14   provided, that you created?

15   A.  Yes.  I didn't put anything specific, I just put what I

16   focused on and specialized in.

17   Q.  And to your knowledge, did Glaze Teriyaki have access to

18   the internet where they would find that information on

19   LinkedIn?

20   A.  Yes.

21             MR. O'DONOGHUE:  Objection to relevance.

22             THE COURT:  Sustained.

23   Q.  Is there anything that you believe is inaccurate with

24   respect to that description of what you did while you were at

25   Glaze Teriyaki the entire time you were there?

 1              MR. O'DONOGHUE:  Objection to form of the question.

 2              THE COURT:  I'll allow it.

 3   A.  No.

 4   Q.  Now were you required to have a business card while you

 5   were working at Glaze Teriyaki?

 6   A.  Why he.

 7   Q.  Did you have business cards while you were an intern at Red

 8   Bull?

 9   A.  I did not.

10              MR. O'DONOGHUE:  Objection to relevance.

11              THE COURT:  Overruled.

12   Q.  I'm showing you now what we have had premarked for

13   identification and not objected to in the JPTO as Plaintiff's

14   Exhibit 2.  Can you take a look at that?

15              Got that?

16   A.  Yes.

17   Q.  Can you please tell me what that is?

18   A.  The company credit card.

19   Q.  And how is it that you know it's a company credit card?

20   A.  It says Glaze Teriyaki franchise as well as my name.

21   Q.  And is that your signature on the card?

22   A.  Yes.

23   Q.  And this is the card you had while you were at Glaze

24   Teriyaki?

25   A.  Yes.

```
 1          MR. NOHAVICKA:  Your Honor, I offer Plaintiff's
 2   Exhibit 2 for identification into evidence.
 3          THE COURT:  Received.
 4          MR. O'DONOGHUE:  Objection.
 5          THE COURT:  There was no objection voiced.  Is it
 6   objected to in the joint pretrial order?
 7          MR. O'DONOGHUE:  No, I'm objecting because counsel
 8   failed to lay a proper foundation for this record.
 9          THE COURT:  Go ahead.
10   BY MR. NOHAVICKA:
11   Q.  You have Exhibit 2 for identification in front of you?
12   A.  Yes.
13   Q.  What is this document?
14   A.  The company credit card.
15   Q.  And how is it that you know it's a company credit card?
16   A.  It has the title Glaze Teriyaki franchise as well as my
17   full name.
18   Q.  And did you sign this document?
19   A.  I did.
20   Q.  Is that your signature on the document?
21   A.  It is.
22   Q.  Did you use this document while you were employed at Glaze
23   Teriyaki?
24   A.  Yes.
25   Q.  And who issued this document to you?
```

1   A.   Paul and Dennis.

2   Q.   Did you have authorization from them to use this document?

3   A.   Yes.

4        MR. NOHAVICKA:  Your Honor, I now offer it into

5   evidence.

6        THE COURT:  Any objection?

7        MR. O'DONOGHUE:  Yes, your Honor.

8        THE COURT:  Basis?

9        MR. O'DONOGHUE:  Once again this is -- they have still

10  not actually identified what the document is.  The document is

11  a representation of something else that clearly could not be

12  used the way that they're stating it could be used.

13       THE COURT:  Let me see the document.

14       Is this a copy of the card?

15       THE WITNESS:  Yes.

16       THE COURT:  It's a photocopy of the card.

17       THE WITNESS:  Yes.

18       MR. O'DONOGHUE:  That was never said, your Honor.

19       THE COURT:  Any objection?

20       MR. O'DONOGHUE:  No.

21       THE COURT:  Received.

22       (Plaintiff's Exhibit 2 received in evidence)

23       MR. NOHAVICKA:  Your Honor, I would like to publish it

24  to the jury.

25       THE COURT:  You may.

1   BY MR. NOHAVICKA:

2   Q.   And could you just describe to the jury what you see now on

3   your screen what this document is?  It's a copy of something,

4   right?

5          Now the jury can see what it is that you have now just

6   identified, but can you please, for the jury, explain what this

7   is.

8          THE COURT:  You may proceed, go ahead.

9          MR. NOHAVICKA:  Could you ask the jury if they're able

10   to see it now?

11          THE COURT:  Ladies and gentlemen, are you able to see

12   it.

13          JUROR:  It was --

14          THE COURT:  It was on but it's not on now.

15          JUROR:  It's back on.

16          THE COURT:  Do you have it, ladies and gentlemen?

17          Very good.

18   BY MR. NOHAVICKA:

19   Q.   Please tell the jury what this is.

20   A.   My company credit card with Glaze.

21   Q.   And when did you get this company credit card?

22   A.   In the last year of my employment with them.

23   Q.   Can you tell the jury what year that was?

24   A.   2014.

25   Q.   And for what purposes did you use the credit card?

GABINAL25

1   A.   Supplies, errands, anything in particular or relevant to

2   marketing.  If I needed to order things from the printers, if I

3   needed to order things, like collateral, any promotional

4   material, whether it's paper or sunglasses or something fun, I

5   was given the authority to use that card for those types of

6   things.

7   Q.   And did you ever use it for personal reasons?

8   A.   No.

9   Q.   I'm just going to put up the second page of that, and tell

10  the jury what that is on the back of that credit card.

11  A.   My signature.

12  Q.   And you signed that yourself?

13  A.   I did.

14  Q.   I would like to now look at Exhibit Number 3 for

15  identification.  Do you see that document?

16  A.   I do.

17  Q.   And can you tell me what it is?

18  A.   It's my business card.

19  Q.   Is it the business card or is it a copy?

20  A.   It's the business card or a copy of the business card.

21  Q.   And where did you get this card?

22  A.   I got the card from our designer.

23  Q.   And who is the designer?

24  A.   Richard Norris.

25  Q.   Is he affiliated with Glaze Teriyaki?

 1   A.   As a third party design agency.

 2   Q.   And did you have the permission of Glaze Teriyaki to have

 3   this card made for you?

 4   A.   It was their idea.

 5   Q.   When you say "they," who is they?

 6   A.   Paul and Dennis.

 7   Q.   Both of them here?

 8   A.   Yes.

 9   Q.   They wanted you to have a business card?

10   A.   Yes.

11            MR. O'DONOGHUE:  Objection, leading.

12            THE COURT:  Yeah, the last one, they wanted to you

13   have a business card, is stricken, as is the answer.

14            Next question.

15   Q.   Who wanted you to have a business card?

16   A.   Paul and Dennis.

17   Q.   And Paul and Dennis from where?

18   A.   From Glaze.

19   Q.   And did they tell you why they wanted you to have a

20   business card?

21   A.   As I was getting more responsibility and meeting more

22   people for cross promotional purposes or just catering clients,

23   anyone -- it was kind of getting old me giving them my personal

24   gmail address, and I didn't think they would take me seriously

25   if I was cold emailing these potential clients from a gmail.

GABINAL2                        Naldo - Direct

1   And so we figured, as well as handing -- I needed a business

2   card if I met people, so it was a good idea for me to be able

3   to identify myself and also show my legitimacy as an employee

4   and representative of Glaze.

5   Q.  And is Plaintiff's Exhibit 2 for identification a fair and

6   accurate copy of the actual business card that you were issued

7   by Glaze?

8   A.  Yes.

9   Q.  And when were you issued this card?

10         MR. O'DONOGHUE:  Objection, it's Exhibit 3.

11         MR. NOHAVICKA:  Sorry, thank you, counsel.

12  Q.  Exhibit 3.

13  A.  Towards the end of my -- in the summer of 2012, towards the

14  end of my internship.

15         MR. NOHAVICKA:  Your Honor, I'm offering Plaintiff's

16  Exhibit 3 for identification into evidence as Plaintiff's

17  Exhibit 3.

18         THE COURT:  Any objection?

19         MR. O'DONOGHUE:  No objection.

20         THE COURT:  Received.

21         (Plaintiff's Exhibit 3 received in evidence)

22         MR. NOHAVICKA:  May I publish it, your Honor?

23         THE COURT:  You may.

24  BY MR. NOHAVICKA:

25  Q.  And tell us what is depicted now.  I hope it's on your

 1    screen.  Is it?

 2                MR. NOHAVICKA:  It's not on.

 3    Q.  You have the document in front of you?  Explain what the

 4    two separate parts are for the jury.

 5    A.  The business card?

 6    Q.  Yes.

 7    A.  The first part is the front of the business card with the

 8    logo and design of the statue of liberty and a chicken, and on

 9    the back is another version of the logo as well as my name, my

10    company email address, my personal phone number, and the

11    address of the first Glaze Teriyaki.

12    Q.  Could you read to us the email address?

13    A.  Jessica@glazeteriyaki.com.

14    Q.  And who decided that you would have a company email

15    address?

16    A.  Dennis and Paul.

17    Q.  The defendants?

18    A.  Yes.

19    Q.  And when did they decide that?

20    A.  During my internship.

21    Q.  And were you told why you should have that?

22    A.  I think I brought it up, because as I said earlier, I was

23    starting to interact with more clients, more people in

24    association with Glaze, and so I needed a real email address

25    that said I was legitimate and a real representative of Glaze

1    versus using my personal gmail.

2    Q.  Was anything -- were you given any -- withdrawn.

3         Were you given any instructions with respect to who or

4    when you should give this card out?

5    A.  No.

6    Q.  And did you in fact give it out?

7    A.  Yes.

8    Q.  Who did you give it out to?

9    A.  Whomever I met that I felt would be a great connection to

10   have, especially professionally or in relevance to any projects

11   we wanted to do with Glaze, if they were organizations, if they

12   were charities, if they were -- trying to think, organizations,

13   charities, schools.  We used to go to NYU a lot and try to

14   market to them.  Whoever I would note along the way that I felt

15   I could really connect with and do something cool with, I gave

16   my card.

17   Q.  And did there come a time you were told not to give out the

18   card?

19   A.  No.

20   Q.  So I want you to take a look now at Exhibit 5 for

21   identification.  Do you see that document?

22   A.  Got it.

23   Q.  Can you please tell the jury what this document is that

24   you're looking at?

25   A.  The first one?

 1   Q.  This is 0013.

 2   A.  Okay.  The first document that I'm looking at is the social

 3   media proposal that I made prior to our fourth location, third

 4   or fourth location of the San Francisco opening.

 5   Q.  San Francisco?

 6   A.  Yes.

 7   Q.  Did Glaze Teriyaki have a San Francisco restaurant as well?

 8   A.  Yes, two.

 9   Q.  When did you become aware of this?

10   A.  The grand opening for this was about April 2013.

11   Q.  Were you somehow involved with this?

12   A.  Actively, yes.

13   Q.  What was your involvement?

14   A.  The involvement for it was -- a lot of it was social media

15   and marketing.  Our partner from San Francisco who was running

16   that side of things from that coast wanted my help in

17   establishing a strategy for that side or for that restaurant as

18   well as for the grand opening.  So I made a social media

19   proposal wanting to utilize all the different platforms, all

20   the different kind of ideas we had in terms of brand messaging

21   and meet ups and planning.

22   Q.  So is that what Plaintiff's Exhibit 5 for identification is

23   then?

24              MR. O'DONOGHUE:  Objection, leading.

25              THE WITNESS:  Sorry?

1           THE COURT:  Rephrase.

2    Q.  I'm talking about Plaintiff's Exhibit 5 for identification.

3    A.  Yes.

4    Q.  And you were describing what it was.

5    A.  Yes.

6    Q.  And is it anything more than what you just said?  Is it

7    anything else other than a social media --

8           MR. O'DONOGHUE:  Objection, leading.

9           THE COURT:  No, it's based on the testimony that was

10   delivered.

11   A.  Yes, there are some kind of cold emailing or follow ups

12   with catering, me reaching out to potential clients or

13   customers that would like our business for their law firms or

14   for their offices I would reach out and try to create

15   something.

16          THE COURT:  You're being asked about a document.

17          THE WITNESS:  I have a few documents, I'm sorry.

18          THE COURT:  You're only being asked about one

19   document.

20   Q.  We're talking about the social media proposal.

21   A.  Okay.

22   Q.  Did someone request that you prepare this document?

23   A.  No, I did it myself.

24   Q.  For whom did you prepare it?

25   A.  I prepared it for Paul for Dennis, for Richard, for the

 1  whole team to look at.

 2  Q.  We know who Paul is --

 3  A.  Paul and Dennis.

 4  Q.  -- and we know who Dennis is, but you are mentioning other

 5  names.  Richard?

 6  A.  Richard Norris is our third designer, Ian and Jessie are

 7  the partners in San Francisco.

 8  Q.  You said that you presented this to Paul and to Dennis and

 9  to Richard and to Jessie?

10  A.  Yes.

11  Q.  What was done as a result of that?

12  A.  They blew it off.

13          MR. O'DONOGHUE:  Objection, leading, and objection,

14  non-responsive.

15          MR. NOHAVICKA:  I withdraw the question.

16          THE COURT:  All right.  And the answer is stricken.

17  Q.  Were you required to go -- sorry, Jessica, you don't have

18  to look at that anymore.

19          THE COURT:  Listen to words of the question, if you

20  would.

21          THE WITNESS:  Okay.

22  Q.  Were you required to go to San Francisco?

23  A.  I was offered to go to San Francisco, yes.

24  Q.  When you say you were offered, what does that mean?

25  A.  They knew I wanted to get involved on the West Coast, or at

1    least to help with the grand opening, so they offered the

2    opportunity to help out with that.

3    Q.  And did you capitalize on that?

4    A.  Yes.

5    Q.  And what did you do?

6    A.  I flew over for the week, and I assisted in that grand

7    opening and the preparations of it as well as the execution of

8    it.

9    Q.  And how did you get to San Francisco?

10   A.  Through purchasing a ticket, a flight ticket.

11   Q.  And did you go there?

12   A.  I did.

13   Q.  What did you do when you were there?

14   A.  When I got to San Francisco?

15   Q.  Yes.

16           MR. O'DONOGHUE:  Objection.

17           THE COURT:  Overruled.

18   A.  Got to San Francisco, did everything -- at least for what I

19   did it was -- I did a lot of documenting of the activity

20   around -- for social media purposes for online marketing

21   purposes, I did a lot of documenting, I did a lot of

22   photographing, a lot of kind of scoping out the restaurant

23   because we had a lot of marketing material we needed to put

24   around.

25           THE COURT:  Avoid the "we."

1          Go ahead.

2  Q.  You, what did you do?

3  A.  Okay.  I got to San Francisco, I did a lot of marketing

4  for -- at least that was my understanding, that's what I wanted

5  to do.  And I went to the printers, I designed some material

6  for the inside of the restaurant, but then I also ended up

7  running a lot of errands.  So I would borrow the partners' car

8  and go to the restaurant supply store, I would go to the

9  printers, I would run a lot of errands in addition to a lot of

10  the marketing duties.  When I got to the restaurant I did a lot

11  of photography, I did a lot of art design, I did a lot of the

12  assisting with setting up, cleaning up on the day of the grand

13  opening, I helped out busing.

14  Q.  When you say "busing," could you please describe that?

15  A.  Cleaning tables, trash, putting things away, busing tables.

16  Q.  Why did you never -- withdrawn.

17          Did you ever ask to get paid --

18  A.  I did.

19  Q.  -- from Paul or Dennis?

20  A.  I did.

21  Q.  And what did they say?

22  A.  It was always next time or let's talk next week, we want to

23  pay you, but either we're waiting on an investor and it's going

24  to hit big, Jess, just wait, just wait.  It was always:  Just

25  wait.  And once in a while they would give me like a couple of

 1   checks, a few checks every four or five months to kind of keep

 2   me around, but it was never something that was sustainable, it

 3   just always felt like an allowance.

 4   Q.  How many times would you say you asked either of them for

 5   some kind of compensation for the work that you did?

 6            MR. O'DONOGHUE:  Object to the form of the question.

 7            THE COURT:  Sorry?

 8            MR. O'DONOGHUE:  I have an objection to the form of

 9   the question.  He said how many times would you say you asked,

10   he did not ask her how many times she actually asked.

11            THE COURT:  Rephrase.

12   Q.  How many times did you ask to get paid?

13   A.  I asked a few amount of times, like several times.

14   Q.  I want you to take a look at what has been marked

15   Plaintiff's 6 for identification.  That's last one.  Do you see

16   that document?

17   A.  Mm-hmm.

18            THE COURT:  You have to answer in words.

19   A.  Yes.

20   Q.  What is that document?

21   A.  It's an email I sent out --

22   Q.  Don't tell us what it says, just say what it is.

23   A.  It's an email.

24   Q.  And who is the email from?

25   A.  It's an email from me.

 1   Q.  And who is it to?

 2   A.  To Paul, and I CC'd Dennis.

 3   Q.  When was this sent?

 4   A.  May 31st, 2013.

 5   Q.  When you say it was sent to Paul, I'm assuming of course

 6   Paul Krug, who is here?

 7   A.  Yes.

 8   Q.  How do you know it was sent to him?

 9   A.  Sorry?

10   Q.  Is his email address on there?

11   A.  Yes.

12   Q.  Is that your email address?

13   A.  It is my email address.

14   Q.  And you sent that to him?

15   A.  I did.

16           MR. NOHAVICKA:  Your Honor, I offer Plaintiff's 6 for

17   identification into evidence.

18           THE COURT:  Any objection?

19           MR. O'DONOGHUE:  Objection.

20           THE COURT:  Basis?

21           MR. O'DONOGHUE:  I have a variety of objections to

22   this document.  Firstly, the document itself is a forwarded

23   email --

24           THE COURT:  Let me first look at the joint pretrial

25   order.

 1          MR. O'DONOGHUE:  It's not there, your Honor.  There's

 2   no objection.

 3          THE COURT:  It's not in the joint pretrial order?

 4          MR. NOHAVICKA:  It is there, but there's no objection

 5   to it.

 6          THE COURT:  Overruled.

 7          MR. O'DONOGHUE:  Your Honor, if you look at the

 8   document itself, it is clearly an inappropriate document.  What

 9   it is listed as on the joint pretrial order is not what is

10   before the witness.

11          THE COURT:  Show me the document that you understood,

12   Mr. O'Donoghue, was Item 6 under 9A.  Bring that up to the side

13   bar if you will, please.

14          Ladies and gentlemen, we'll take a ten-minute break.

15   Please don't discuss the case.

16          MR. NOHAVICKA:  This is the last document.

17          THE COURT:  All right.  Hold off.  We can take your

18   break after the examination is completed.  That probably makes

19   more sense.

20          (Continued on next page)

21

22

23

24

25

1           (At sidebar)

2           MR. O'DONOGHUE:  I can't find the clean document.  My

3    point, your Honor, is that if you look at the document itself,

4    this is from Ms. Naldo to Yesy Sanchez.  This is a forwarded

5    email.  You can see it says forwarded message.  There's no way

6    to tell that this is accurate.  You could doctor this anyway

7    you want.  There's no way to tell.  It's a stub that cuts off a

8    chain of emails.  It's incomplete and it's not the original

9    document.  If they wanted to offer her direct e-mail to my

10   clients, that would make sense.  And I know emails is a weird

11   thing that we're trying to figure out evidence-wise still, but

12   that forward, redacted information, et cetera.

13           THE COURT:  The witness testified this is -- the text

14   below is the mail she sent.  I will be happy to instruct the

15   jury that what appears above the words from Jessica Naldo, date

16   May 31, 2013, is not in evidence.

17           MR. O'DONOGHUE:  If you look here also, your Honor, it

18   clearly is cut off mid sentence.  There's more to it.

19           THE COURT:  There may very well be.  You did not

20   object.  That may have been the email that was sent cut off in

21   mid sentence.  I read many emails cut off in mid sentence.

22           MR. O'DONOGHUE:  Your Honor, this is not the email

23   showed in her deposition.

24           THE COURT:  Mr. O'Donoghue, I have given you the

25   opportunity.  I have in front of me the joint pretrial order,

1    this is Number 6, objection, blank, basis for objection, blank.

2          I have given you an opportunity to -- don't start

3    formulating your sentences.  I have given you an opportunity to

4    show me what you think the Exhibit 6 is, and you told me that

5    you haven't been able to do it.  I understand that.  I have

6    heard the witness's testimony.  The witness has identified this

7    as an email that she sent, and it's received.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                (In open court)

 2           THE COURT:  Ladies and gentlemen, you will see on

 3   Exhibit 6 in a moment that there is material above the line

 4   Jessica Naldo, date May 31, 2013 at 9:39:03 a.m.  The material

 5   above that is not being offered into evidence and it's not

 6   being received into evidence and you're to disregard it.  It's

 7   the email part that is below that.  Go ahead.

 8           MR. NOHAVICKA:  Your Honor, I formally --

 9           THE COURT:  You're offering 6 and over objection it's

10   being received.

11           (Plaintiff's Exhibit 6 received in evidence)

12           MR. NOHAVICKA:  And permission to publish it.

13           THE COURT:  Granted.

14   BY MR. NOHAVICKA:

15   Q.  Jessica, you testified earlier you sent an email showing

16   concern about your compensation, is that fair?

17   A.  Yes.

18   Q.  And is this the email that you're talking about?

19   A.  This is.

20   Q.  And could you please go to the section -- the portion of

21   the email where you do make your concerns known to your

22   employers, and could you read it to the jury?

23   A.  The whole thing?

24   Q.  Not the whole thing, but just the important part there

25   where you bring it to their attention?

1    A.  Is there a specific --

2    Q.  The jury never saw this before.

3    A.  Could I read the whole thing?

4    Q.  Sure.

5    A.  Paul and Chef:  Hey, Guys, I'm hoping to talk with you --

6            THE COURT:  You don't have read the whole thing.  The

7    jury has it.  If there's a portion of the document that you

8    want to ask the witness a question about, you can do that.

9            Otherwise, ladies and gentlemen, you will have all the

10   exhibits in the case in the jury room.  At the conclusion of

11   the case you can read it, or you can read it now on the screen.

12           MR. NOHAVICKA:  In that case, your Honor, I have no

13   further questions, and I pass the witness.

14           THE COURT:  All right.  Ladies and gentlemen, now

15   we're take our mid-afternoon break.  Please do not discuss the

16   case among yourselves or with anyone.  We'll be back in action

17   in ten minutes.  Thank you.

18           (Jury not present)

19           THE COURT:  See you all in ten minutes.

20           (Recess taken)

21           (Continued on next page)

22

23

24

25

1     THE COURT:  Please take the witness stand and bring

2     the jury in.

3          (Jury present)

4          THE COURT:  Please be seated.

5          Mr. O'Donoghue, you may cross-examine.

6          MR. O'DONOGHUE:  Thank you, your Honor.

7     CROSS-EXAMINATION

8     BY MR. O'DONOGHUE:

9     Q.  Good afternoon, Ms. Naldo.  Ms. Naldo, earlier your

10    attorney asked you about your education at St. John's.  You

11    have not actually graduated yet, is that correct?

12    A.  No.

13    Q.  It is not correct --

14    A.  I'm sorry.  I did not, no.

15    Q.  You said you have two classes left, correct?

16    A.  Yes.

17    Q.  You started in 2007, is that right?

18    A.  Yes.

19    Q.  And during the period that you worked allegedly for Glaze

20    Teriyaki, which was somewhere approximately February 2012

21    through August of 2014, you were a student at St. John's

22    University, correct?

23    A.  Yes.

24    Q.  And you said that you were taking a full course load, is

25    that right?

 1   A.  Nine to 18 credits, yes.

 2   Q.  Were you receiving student loans at the time?

 3   A.  Some, yes.

 4   Q.  And were you required as a condition of your student loans

 5   to take a certain number of credits per semester?

 6   A.  Yes.

 7   Q.  And if you dropped a class or withdrew from a class, would

 8   you receive a refund for that class that you paid for?

 9   A.  I think if I did it in time, yes.

10   Q.  And so when you began working allegedly for Glaze as an

11   intern in the fall of 2012, do you know how many credits you

12   took that semester?

13   A.  I don't recall.

14   Q.  Did you frequently withdraw from classes when you were in

15   college?

16           MR. NOHAVICKA:  Objection, your Honor, relevance.

17           THE COURT:  I'll allow it on cross-examination.  Go

18   ahead.

19   A.  I did.

20   Q.  And did you receive a number of Fs as a result in other

21   classes?

22   A.  I did.

23   Q.  In the fall of 2012, if I told you that you withdrew from

24   four courses and failed a fifth, would that surprise you?

25   A.  No.

1    Q.  And that would be zero credit hours, correct?

2    A.  Ok.

3    Q.  And then in the spring of 2013, if I told you you

4    registered for six classes, withdrew from two and failed two,

5    would that surprise you?

6    A.  No.

7    Q.  That would be six credits?

8    A.  Ok.

9    Q.  And then in the fall of 2013, you received 12 credits and

10   you failed one class and you withdrew from another.  Does that

11   sound accurate to you?

12   A.  I don't recall, but ok.

13   Q.  And then in the spring of 2014, which would have been the

14   last semester that you worked with Glaze, apparently, you

15   registered for three and withdrew from three for zero credits.

16   Does that sound accurate to you?

17   A.  Sure.

18   Q.  Earlier you told us that you were in school full time and

19   you had been juggling work and school but in reality you

20   weren't really taking that many classes in this time period,

21   correct?

22   A.  I did.  But, like you said, I would withdraw or it didn't

23   work out.

24   Q.  Except for the fall of 2013, you only actually completed

25   three classes in two years, correct?  You are not sure?  And so

1  it's now been nine years since you began college, correct?

2  A.  Ok.

3  Q.  And you are how many credits short, six?

4  A.  Yes.

5  Q.  Did the course schedule prevent you from working certain

6  hours?

7  A.  The course schedule?

8  Q.  You said you didn't necessarily not go to some of these

9  classes; they just didn't work out.  Am I wrong to assume that

10  you went to some of them but never finished them?

11  A.  Yes, sure.

12  Q.  As a result of being in school full time, did that affect

13  your ability to work certain hours with any other company,

14  including Glaze?

15  A.  I think me working for Glaze and being as committed as I

16  was, it affected my school, unfortunately.

17  Q.  You put your unpaid job over your college education?

18  A.  Unfortunately.

19  Q.  I just want to be clear.  You said you began work somewhere

20  in February of 2012, right, as an intern?

21  A.  Yes.

22  Q.  And then the first and apparently the only e-mail

23  documentation or other documentation you have where you

24  requested to be paid is what your attorney showed you before he

25  sat down, which was from May of 2013, right?

1    A.   Yes.

2    Q.   In the first 15 months of your employment there is no other

3    documentation where you asked to be paid, is that right?

4    A.   Not that I know of.

5    Q.   And subsequent to that, from May of 2013 to the end of your

6    alleged employment, which I think we agree was about August of

7    2014, another 15 months, give or take?

8    A.   Ok.

9    Q.   You never had another document or any other e-mail that

10   would show that you requested payment, correct?

11   A.   We had discussions and, unfortunately, I do have e-mails

12   from 2014.  But after I left, my access to that account was

13   taken away, so I was never able to provide those.

14          MR. O'DONOGHUE:  I am going to move to strike as

15   nonresponsive to my question.

16          THE COURT:  I'll allow it to stand, but you have to

17   listen to the question and answer the question that's asked of

18   you.  Ok?

19          THE WITNESS:  Ok.

20          THE COURT:  Thank you.

21   Q.   It's a yes or no question, ma'am.  Do you have any other

22   documentary proof, other than that one e-mail, that you can

23   produce to us today that shows that you asked to be paid at any

24   other time?

25   A.   That was all I could provide.

1   Q.  The one e-mail?

2   A.  Just that one e-mail.

3   Q.  Was e-mail your primary way of communicating with the

4   principals of Glaze?

5   A.  In terms of?

6   Q.  How did you communicate with the owners?

7   A.  In person.

8   Q.  And how often were you there?

9   A.  A few times a week.

10  Q.  And how many hours each time?

11  A.  As an intern or after being an intern?

12  Q.  You can break it down however you would like.

13  A.  As an intern I was part time and that was 20 to 30 hours a

14  week, and then after I was an intern I would go in more often

15  and that would be about 40.  It increased as -- the longer I

16  worked there.

17  Q.  But you don't have any records that show the hours you

18  worked, correct?

19  A.  Unfortunately, there are no records.

20  Q.  You don't have a punch clock or pay stubs or anything like

21  that?

22          MR. NOHAVICKA:  Objection, your Honor.  She is not the

23  employer.

24          THE COURT:  Overruled.  But I'll sustain it as to, or

25  anything of the like.

 1              MR. O'DONOGHUE:  I'm sorry.  I'll be more specific,

 2   your Honor.  I'll break it down question by question.

 3   Q.  Did you punch a clock or point of sales system, anything

 4   like that, to record the hours that you worked?

 5   A.  No.  They never provided me that.

 6   Q.  Did you keep a Google spreadsheet or an Excel spreadsheet

 7   of your hours?

 8   A.  Random notes here and there, but no.

 9   Q.  You don't have those, right?

10   A.  When you say hours, do you mean hours inside the

11   restaurant?

12   Q.  I would love to see anything that shows any hours you

13   worked.  Do you have anything that shows the hours you worked?

14   A.  I don't have any hours, no.

15   Q.  You don't have a Word document, e-mail, spreadsheet,

16   anything that would document the hours you worked, right?

17   A.  No.

18   Q.  You said before that you worked, you did things like you

19   were a cashier, you bussed tables, you did deliveries, that

20   sort of thing, correct?

21   A.  Yes.

22   Q.  The other people who worked at Glaze in the restaurant, did

23   they punch in and punch out daily?

24   A.  They did.

25   Q.  And they had pay stubs, paychecks, right?

1   A.  Yes.

2   Q.  You've seen them from ADP or some other company, correct?

3   A.  Yes.

4   Q.  And everyone else, every other employee at all three

5   restaurants that you're aware of, would swipe in and swipe out

6   daily, correct?

7   A.  Those who were cashiers or kitchen employees, yes, or

8   managers.

9   Q.  All of them punched in and punched out, correct?

10  A.  Cashiers and kitchen employees and managers, yes.

11  Q.  And they all received paychecks?

12  A.  Yes.

13  Q.  Biweekly?

14  A.  That, I don't know, sorry.

15  Q.  But you did not?

16  A.  No.

17  Q.  When you were at the company, can we agree about 30 months

18  is the time period we are talking about?

19  A.  Sure.

20  Q.  What other countries did you travel to during that time?

21  Do you need some help?

22  A.  Sure.

23          MR. NOHAVICKA:  Objection.  Assumes a fact not in

24  evidence.

25          THE COURT:  Rephrase it.

1    Q.  You traveled to Mexico at one point while you worked for

2    Glaze Teriyaki, correct?

3    A.  Yes.  It was a family trip.

4    Q.  Did you have to ask permission to go on vacation?

5    A.  Yeah.  I asked for permission out of courtesy.

6    Q.  Is there an e-mail or something that shows that?

7    A.  Probably from the past.  I am not sure if it's in there.

8    Q.  Did you go to Belize at one point?

9    A.  Yes.

10   Q.  Do you know what year that was?

11   A.  April, May 2014.

12   Q.  Did you ask permission for that trip?

13   A.  I brought it up most likely.  I'm not completely sure.

14   Q.  How long were you there for?

15   A.  A week.

16   Q.  How long were you in Mexico for?

17   A.  A week.

18   Q.  Did you go to Savannah, Georgia, at some point?

19   A.  Yeah.

20   Q.  Do you know how long you were there for?

21   A.  Maybe a week.

22   Q.  Did you ask permission to go on that trip?

23   A.  I let them know.

24   Q.  When you say you let them know, in other words, you would

25   say, hey, guys, I am going to go out next week, I am going on a

1   trip.  You wouldn't say:  I need to take a week off.

2   A.  I gave them a heads-up.

3   Q.  Did you go to Seattle regularly while you were at Glaze

4   Teriyaki?

5   A.  Yeah.  To see my family.

6   Q.  About how many times a year do you think you did that?

7   A.  If I was lucky, twice.

8   Q.  For 2012, 2013, 2014, about twice a year?

9   A.  Once or twice a year.

10  Q.  For about a week?

11  A.  More or less, the holidays.

12  Q.  Did you have occasion to go to California more than once

13  while you were there?

14  A.  San Francisco.

15  Q.  You tell me.

16  A.  I went to San Francisco for the grand opening.  I stopped

17  in San Francisco when I stopped in Lake Tahoe for New Year's.

18  I've been to California a couple of times, yes.

19  Q.  You went to Lake Tahoe, correct?

20  A.  For New Year's, yes.

21  Q.  That's in Nevada?

22  A.  Yes.

23  Q.  Anywhere else you can recall you traveled to between 2012

24  to 2013, while you were allegedly working for the company?

25  A.  I am not sure.

1    Q.  Did you regularly take trips, weekend trips, to go to music

2    festivals and things like that?

3    A.  On the weekends.

4    Q.  You said before you worked seven days a week, right?

5    A.  Yes.

6    Q.  Weekends --

7    A.  I mean, I could work seven days a week, yes.  Five days are

8    the actual work days.

9    Q.  In other words, you have a flexible schedule.  If you

10   wanted to work Sunday and not work Tuesday --

11   A.  I had a remote schedule.

12   Q.  Weekends would count as work days potentially, right?

13   A.  I guess, if I was a cashier.

14   Q.  Were you a cashier?  I thought you were marketing --

15   A.  I thought I was, too.

16   Q.  Interesting.

17          MR. NOHAVICKA:  Your Honor, I am objecting to counsel.

18   I don't know if you are hearing his comments under his breath.

19   I'm objecting and asking him to stop.

20          THE COURT:  Mr. O'Donoghue, knock it off.

21          MR. O'DONOGHUE:  Thank you, Judge.

22   Q.  Ms. Naldo, let's talk about your relationship with your

23   employer.  Were you required to work full time?

24   A.  No.  But I was asked to come in a lot.

25   Q.  I am going to ask you to answer the questions with yes or

 1    no.

 2    A.  No.

 3    Q.  Did the company give you set work hours or set schedules

 4    where you had to be at the restaurant or anywhere else?

 5    A.  There was no set schedule.

 6    Q.  Were you required to appear for trainings or meetings

 7    weekly, daily, monthly?

 8    A.  We would have meetings every once in a while, yes.

 9    Q.  Were you required to be at specific meetings?  There is a

10    10 a.m. Monday meeting and you have to be there, or no?

11    A.  If we talked about it, I would show up, yes.

12    Q.  What about trainings, did you ever have to attend a

13    training?

14    A.  I was never trained.

15    Q.  The people who work in the restaurants, they go to

16    trainings and meetings on a regular basis, don't they?

17    A.  They are managers and cashiers.

18    Q.  They have trainings and meetings?

19    A.  For their specific position.

20    Q.  But you didn't have those?

21    A.  No.

22    Q.  Did you have a direct supervisor who managed your work on a

23    regular basis or did you just sort of submit things on a

24    when-available basis?

25    A.  I would get approval from Dennis or Paul, but never had

1   really direct supervision.

2   Q.  Did they give you a cell phone or a computer or any other

3   tools or equipment that you would need?

4   A.  No.  Just use my own personal electronics.

5   Q.  You didn't receive a salary or you didn't receive hourly

6   payment.  That's why we are here, correct?

7   A.  Correct.

8   Q.  You didn't get commissions if you booked a catering job or

9   anything like that?

10  A.  I would be able to keep my tips if I delivered something,

11  but that was like $15 a day.

12  Q.  You said you went to San Francisco.  The company paid for

13  your plane ticket, correct?

14  A.  They did.

15  Q.  They paid for one night in a hotel in San Francisco?

16  A.  One night, yes.

17  Q.  Then you stayed with your family in a job share the rest of

18  the time, correct?

19  A.  My mom came to visit me in San Francisco, so I stayed in a

20  time share that she had arranged for herself.

21  Q.  Did you have to submit written reports to the owners on a

22  regular basis -- excuse me -- on any basis?

23  A.  It wasn't required, but I did.  I would send them updates.

24  Q.  Updates by e-mail or were they formal written reports?

25  A.  By e-mail or I would have something typed up and I would

 1  present it to them in person.  It was usually easier to present

 2  it in person because sometimes they didn't respond to my

 3  e-mails, so it was easier to get a response if I happened to be

 4  face to face.

 5  Q.  Could you quit at any time, as far as you know?

 6  A.  Yeah.

 7  Q.  Could you have been terminated at any time, as far as you

 8  know?

 9  A.  Yeah.

10  Q.  Were you under any contract to work there?

11  A.  No contract.

12  Q.  And do you consider what you did to be an essential part of

13  what Glaze did for work as the business of Glaze?

14  A.  I do.

15  Q.  Now, you know if when you stopped working there they

16  replaced you?

17  A.  I know that when I left they ended up hiring someone to

18  take over my social media or marketing duties that was part of

19  my position when I was at Glaze.

20  Q.  Before you worked there, was someone else doing that?

21  A.  No.  It was me.

22  Q.  Do you know how long the company was in operation before

23  you came on in August of 2012?

24  A.  I think about a good year.

25  Q.  While you worked there, were there professionals in the

1  marketing public relations media world that you interfaced with

2  as part of your role?

3  A.  You mean in collaboration?

4  Q.  Let me withdraw that.  There was a couple of questions

5  there.

6       While you worked with Glaze, did Glaze employ a public

7  relations company to handle its public relations?

8  A.  Yes.  Gita Group.

9  Q.  And was one of your responsibilities to interface with

10  Gita?

11  A.  Actively, yes.

12  Q.  And what did Gita do for the company?

13  A.  Gita was the PR girl -- she is the agency or the head of

14  Gita Group.  So they did the PR for Glaze.

15  Q.  As part of PR, did they do social media outreach and things

16  like that, too?

17  A.  That was one of their duties, yes.

18  Q.  So you and Gita would do Facebook, Instagram, Twitter, that

19  sort of thing?

20  A.  Yes.

21  Q.  Do you know how much Gita was paid to do that work monthly?

22  A.  A lot.  I am not sure.

23  Q.  What is a lot?

24  A.  Hundreds of dollars.  I don't have a specific number.  I

25  don't know those details.  Those finances are under them.

(212) 805-0300

1    Q.  They did some of the same things you did?

2    A.  Who is they?

3    Q.  Gita.

4    A.  They did some of the same things I did?

5    Q.  Yes.

6    A.  Essentially.  On the PR standpoint of things, social media.

7    Q.  And is there an independent marketing company that works as

8    a third party with Glaze?

9    A.  Not that I know of.

10   Q.  Other than Gita, you didn't interface with any marketing

11   personnel or media people?

12   A.  Gita and Project 13.

13   Q.  What is Project 13?

14   A.  The third-party design agency.

15   Q.  Is that who Richard works for?

16   A.  Yes.

17   Q.  What sort of things did they do for Glaze?

18   A.  Web development, graphic design, big projects, such as

19   menus, signage.  He did a lot of the logos, a lot of the cool

20   graphics with the stuff for the business cards, and I did a lot

21   of the smaller things.

22   Q.  What do you mean by smaller things?

23   A.  Little stuff, little tweaks on the templates.  I would work

24   with him on printing out big projects.  I would collaborate

25   with him quite often on verbiage.  When it came to content and

1    copy, we both would go back and forth on terms of what sounded

2    right, what looked good, what was accurate, what was updated,

3    numbers, things like that.

4    Q.  And that took 30 hours a week working with Richard and

5    changing verbiage and making tweaks?

6    A.  No.  That includes catering, it includes in-store

7    promotions, it includes arranging things in the restaurant, it

8    includes cleaning, it includes being a cashier, it includes

9    being a delivery person.  30 weeks did not involve just the

10   social media.  There was a big aspect.  There is more to those

11   30 weeks.

12   Q.  I said 30 hours.

13   A.  I apologize.  30 hours.

14   Q.  You are saying there was a very small piece of what you did

15   on a weekly basis was the PR, marketing, and branding, and most

16   of what you did was the sort of work that the restaurant

17   employees would have otherwise done, correct?

18   A.  No.  Social media was a big part of it.  I mean, to break

19   it down in terms of my marketing position, I did social media,

20   I collaborated with the designer, we made all this material

21   together, but at the same time I was responsible for

22   distributing them.  I was responsible for targeting the right

23   demographics, the right target markets, the right audience,

24   going out into the public, going out to colleges, going out to

25   organizations, charities, farmers markets, flea markets.

1  Q.  What I'm asking you is, in addition to the professionals

2  you worked with at Project 13 and Gita Group, how many hours a

3  week were you required to actually do that type of work in

4  addition to what they were doing?

5  A.  I'm sorry.  Can you repeat that?

6  Q.  You said that Project 13 and Gita Group were the outside

7  professionals that did a lot of the same sort of work you did

8  and then you were sort of responsible for distributing.  Is

9  that accurate?

10  A.  Sure.

11  Q.  The question is, is it your testimony today under oath that

12  your work for the company, in addition to those professional

13  companies, took 30 hours a week?

14  A.  More or less.

15  Q.  When you worked for the one group, I think you testified

16  about them, were you paid?

17  A.  I was.

18  Q.  And you said you were an assistant there, but you also did

19  marketing as an intern, correct?

20  A.  Yes.

21  Q.  As an assistant you were like an administrative assistant?

22  A.  Yes.

23  Q.  You worked for one of the executives or group of people?

24  A.  The marketing manager.

25  Q.  Just briefly, what sort of things did you do as an

1  assistant, the sort of things that we expect?

2  A.  Yeah.  Marketing -- the marketing manager handled a lot, so

3  she handled the marketing and events for the Gansevoort Hotel,

4  Gansevoort Park, things for the rooftop, things for the hotel

5  and for the restaurant, Asellina.

6  Q.  When you worked at ONE Group, did you have to bring in your

7  Social Security card and your driver's license and fill out a

8  bunch of government documents before you started working?

9  A.  Yes.

10  Q.  It's like the I-9 and W-4 and those kinds of things, right?

11  A.  Yes.

12  Q.  When tax time came, you would go to your accountant, or H&R

13  Block or whatever, and you would submit a tax return that shows

14  you worked there, correct?

15  A.  Yes.

16  Q.  The reporter can't take down nonverbal.

17  A.  Yes.

18  Q.  When you worked for Glaze you never filled out that W-2

19  form, right?

20  A.  I did not.

21  Q.  You never had to bring in your Social Security card?

22  A.  No.

23  Q.  You never brought in your driver's license for them to make

24  a copy of, right?

25  A.  No.

1   Q.  You never filled out the I-9, correct?

2   A.  No.

3   Q.  Did you ever fill out a 1099 form?

4   A.  No.

5   Q.  Did you ever file a tax return as a result --

6   A.  I did not.

7   Q.  Let me finish -- as a result of your work at Glaze?

8   A.  I did not.

9   Q.  You did testify before that you were compensated but not on

10  a regular basis, correct?

11  A.  Correct.

12  Q.  And do you know approximately how much you were compensated

13  in 2012?

14  A.  I don't have an estimate.  There were sporadic little

15  amounts.

16  Q.  How about 2013?

17  A.  Same thing.

18  Q.  And 2014?

19  A.  Same thing.

20  Q.  So you agree that you were paid, but you don't know how

21  much?

22  A.  I was paid -- the first time I think I was paid was 400,

23  like a few months later maybe 300.  Once walked his dog, got

24  $20.  It depended really on their generosity and kind of

25  projects that he did and if I brought it up.

1   Q.  By the way, in addition to compensation, had you ever asked

2   the marketing department at St. John's if you could receive

3   credit for the work you did at Glaze?

4           MR. NOHAVICKA:  Objection.  Hearsay.

5           THE COURT:  It's a question.  It calls for hearsay.

6           MR. NOHAVICKA:  It is going to be, yes.

7           THE COURT:  Let me hear the question again.

8           MR. O'DONOGHUE:  Sure, Judge.

9   Q.  Did you ever ask anyone at the marketing department at St.

10  John's if you could receive credit for the work that you did at

11  Glaze?

12          THE COURT:  Overruled.

13  A.  I didn't bring it up.

14  Q.  You asked one of the professors, the head of the

15  department, if you could get credit?

16  A.  I wasn't interested in credit.  I think I was interested in

17  the experience.  It didn't matter if I got credit or not.

18          THE COURT:  Did you hear the words of the question?

19  A.  Sorry.  Say it again.

20          THE COURT:  I will read the question to you.  You

21  asked one of the professors, the head of the department, if you

22  could get credit?  That's the question.

23          THE WITNESS:  I did not.

24  Q.  That's for the whole time period you were there, correct?

25  A.  Correct.

1   Q.  And do you know if St. John's allows students to receive

2   credit for working while they are in school?

3   A.  Yes.

4   Q.  Is there a reason you never asked?

5   A.  I wasn't -- I wasn't interested.  It wasn't a priority for

6   me, even though I could.  I didn't think about it.  I just

7   wanted the opportunity with Glaze.

8           THE COURT:  I'm sorry.  Thank you.

9           MR. O'DONOGHUE:  May I continue, Judge.

10          THE COURT:  Yes.

11  Q.  You said originally when you were hired it was to learn the

12  operations of a restaurant and you were going to shadow Paul,

13  is that right?

14  A.  Yeah.

15  Q.  You did that for a period of time, a few months, correct?

16  A.  Yes.

17  Q.  Was it three months, five months?

18  A.  About three to five months.

19  Q.  That would have been approximately from February of 2012

20  until about the summer of 2012?

21  A.  Yes.

22  Q.  Is that what you would consider your internship period?

23  A.  Yes.

24  Q.  As an operator did Paul do everything in the restaurant?

25  A.  In what capacity?

1    Q.   Did you ever see Paul work a cash register?

2    A.   Yes.

3    Q.   Did you ever see Paul go on a catering run?

4    A.   Yes.

5    Q.   Did you ever see Paul make a delivery?

6    A.   Yes.

7    Q.   Did you ever see Paul wipe a table down?

8    A.   Yes.

9    Q.   Did you ever see Paul greet customers?

10    A.   Yes.

11    Q.   Did you ever see Paul cook food?

12    A.   No.

13    Q.   Dennis does that, right?

14    A.   Dennis does.

15    Q.   As an operator you understand that what you learned was,

16   correct me if I'm wrong, that operators do everything in a

17   restaurant, correct?

18    A.   Yes.

19    Q.   No job is too small or too dirty for the owner, correct?

20    A.   Yes.

21    Q.   You were interested in learning operations, correct?

22    A.   Part of it, yes.

23    Q.   Did you in fact learn operations?

24    A.   I learned, yes.   For Glaze specifically.

25    Q.   Do you have anything, any proof, any documentation,

 1   anything you can point to that shows us what you did 30 hours a

 2   week for Glaze?

 3   A.  No.

 4        MR. O'DONOGHUE:  Just a moment, please.

 5   Q.  Since you left working with Glaze in approximately August

 6   of 2014, have you had any other corporate jobs?

 7   A.  No.  I didn't seek that.

 8   Q.  So you have not worked in marketing or communications since

 9   that time, correct?

10   A.  No.  But I will be.

11   Q.  You've been working as a server in a restaurant, correct?

12   A.  I did.

13   Q.  You are not doing that now?

14   A.  No.

15   Q.  And the last time you and I spoke, which was in October of

16   last year, you had indicated you were at ICE, correct?

17   A.  Yes.

18   Q.  You were seeking a degree there?

19   A.  Yes.

20   Q.  Did you complete that degree?

21   A.  I actually decided not to continue my program.

22   Q.  And are you working right now?

23   A.  No.  I'm taking a break.  I do have a couple of job offers

24   for the end of the month.

25   Q.  Are you in any formal education right now?

 1  A.  Besides my two classes, that's it.  I'm finishing those

 2  classes.

 3  Q.  You are taking those currently?

 4  A.  Yes.

 5  Q.  Why did you wait approximately a year from the time that

 6  your alleged employment ended to bring this action?

 7  A.  I was scared.

 8  Q.  After you left Glaze, did you take an extended trip to

 9  Europe?

10  A.  Yes.

11  Q.  Approximately how long were you gone for?

12  A.  I was in Europe and Asia for about three months, three,

13  four months.

14  Q.  Very quickly, I want to talk about some of this evidence

15  that was put in by your attorney.  On that credit card that we

16  saw, do you know what the limit on it was?

17  A.  No.

18  Q.  Did you ever run up more than --

19       MR. NOHAVICKA:  Objection.  Withdrawn.

20  Q.  Did you ever put more than a few hundred dollars on it?

21  A.  Yes, I can say that.

22  Q.  You said you think you got it in the last year you worked

23  there, is that right?

24  A.  Yes.

25  Q.  How much do you think you charged in total on that card?

1   A.   I could say a couple of thousand.

2   Q.   Over the whole period you had the card?

3   A.   Yeah, sure.

4   Q.   It was a few charges here and there for things you were

5   asked to buy, correct?

6   A.   Yes.

7   Q.   You didn't have autonomy to just buy what you want?

8   A.   Unless it was just supplies for the restaurant.  I never

9   charged personal things on it.

10  Q.   Was it a debit card or a credit card?

11  A.   A credit card.

12  Q.   Was that your idea?

13  A.   I'm sorry?

14  Q.   The card, was it your idea to have the card so you didn't

15  have to keep submitting reimbursement forms and things like

16  that?

17  A.   Yeah.  There were no reimbursement forms.

18          MR. O'DONOGHUE:  I have nothing further.  Thank you,

19  Judge.

20          THE COURT:  Any redirect?

21          MR. NOHAVICKA:  Yes, your Honor.

22  REDIRECT EXAMINATION

23  BY MR. NOHAVICKA:

24  Q.   Jesseca, on the times, the occasions that you were paid in

25  cash, were you given by your employer, Glaze Teriyaki, any kind

1   of receipt for the money that they gave you in compensation?

2   A.  No.

3           MR. O'DONOGHUE:  Objection.

4           THE COURT:  Overruled.

5   Q.  Were you provided with any kind of Google spreadsheet that

6   showed the hours that you worked?

7   A.  No.

8   Q.  Did Glaze Teriyaki withhold taxes for the monies that they

9   paid out to you?

10  A.  I am not sure.

11  Q.  You don't know?

12  A.  I don't know.

13  Q.  Did you receive anything from New York State Department of

14  Tax and Finance?

15  A.  No documents, no.

16  Q.  Anything from the IRS with respect to that?

17  A.  No.

18  Q.  This is the last thing I am going to ask about them.  I am

19  afraid you are going to have to go to the binder and go to

20  Exhibit 9 and specifically you are going to go to 0104 on the

21  top right-hand side.

22  A.  I'm sorry.  Could you repeat that?

23  Q.  It says Naldo, then underscore, 0104, as part of Exhibit 9.

24  A.  Got it.

25  Q.  You mentioned, when counsel was questioning you, Gita.  Is

1    that Gita McCutcheon?

2    A.   Yes.

3           THE COURT:   You have to answer in words, ma'am.

4    Q.   Gita McCutcheon?

5    A.   Yes.

6    Q.   Who is Gita McCutcheon?

7    A.   Gita was the public relations girl for Gita Group.

8    Q.   And what is Gita Group?

9    A.   A public relations firm.

10   Q.   That worked with --

11   A.   With Glaze.

12   Q.   Glaze Teriyaki?

13   A.   Yes.

14   Q.   Yes?

15   A.   Yes.

16   Q.   What is Naldo 0104?  Is it an e-mail?

17   A.   Yes.

18   Q.   Just starting from the top, who was the e-mail from?

19          MR. O'DONOGHUE:   Objection.  This document is not in

20   evidence.

21          MR. NOHAVICKA:   It's not offered yet, your Honor.

22          THE COURT:   Overruled.

23   Q.   Who was this e-mail from?  Is it from Gita?

24   A.   Yes.

25          MR. O'DONOGHUE:   Objection, your Honor, leading.

1              THE COURT:  Overruled.

2    A.  It's from Gita.

3    Q.  Jesseca, you're looking at the top --

4    A.  It's from Gita.

5    Q.  Who was it to?

6    A.  To Ian, CC Paul, as well as Dennis.

7              MR. O'DONOGHUE:  Objection, your Honor.  The witness

8    continues to read from a document that is not in evidence.

9              THE COURT:  This is laying the foundation and if the

10   question isn't asked and answered, you'll have a good objection

11   on foundation.  So it can't be both ways.

12             MR. NOHAVICKA:  Your Honor, also, it's not objected to

13   in the JPTO.

14             THE COURT:  We are not up to that yet.

15             MR. NOHAVICKA:  Yes, your Honor.

16   Q.  You're included on this e-mail?

17   A.  I am.

18   Q.  What was the subject of this?

19             THE COURT:  Let me ask, is there an objection to this

20   exhibit?

21             MR. O'DONOGHUE:  Just that it's not in evidence and

22   she is reading from it.

23             THE COURT:  That wasn't the question I asked.

24             MR. O'DONOGHUE:  The document itself?

25             THE COURT:  Yes.

1          MR. O'DONOGHUE:  I don't think so, no.

2          THE COURT:  You want to offer it?

3          MR. NOHAVICKA:  I would like to offer Exhibit 9.

4          MR. O'DONOGHUE:  Objection.

5          THE COURT:  Pardon me?

6          MR. NOHAVICKA:  I'm not finished yet.  Exhibit 9,

7     0104, 105, 106, only those pages of Exhibit 9 into evidence.

8          THE COURT:  Any objection?

9          MR. O'DONOGHUE:  Improper foundation.

10          MR. NOHAVICKA:  I'll lay the foundation.

11          THE COURT:  Go ahead.

12          Mr. O'Donoghue, let me see you at side bar.

13          (Continued on next page)

1                (At the side bar)

2                THE COURT:  I'm very concerned, Mr. O'Donoghue, and

3       perhaps a little bit lost.  It sounded to me like you were

4       objecting to the asking of foundation questions and counsel

5       indicated there was no objection to the exhibit on the joint

6       pretrial order.  So I asked you if you objected to the exhibit

7       and then you said there was no foundation laid.  I'm a little

8       bit at sea, Mr. O'Donoghue.  I don't quite get it.

9                MR. O'DONOGHUE:  Would you like me to explain?

10               THE COURT:  That's exactly what I would like you to

11      do.

12               MR. O'DONOGHUE:  If counsel would like to lay a

13      foundation for the document -- as you recall, your Honor, he

14      tried with the offer of Plaintiff's 1, he offered it, he

15      couldn't lay a foundation, the witness couldn't support the

16      foundation and it didn't come in, the LinkedIn thing.  We had a

17      side bar about it, didn't come in.

18               Now he's plucking out three pages of approximately 290

19      pages, he is trying to put in all 290 pages, I believe.

20               MR. NOHAVICKA:  No.

21               MR. O'DONOGHUE:  Trying to put in three pages.  Rather

22      than first laying a foundation for those three pages, he is

23      asking the witness to read directly from the document.  At

24      least how I understand it, that's not how a foundation for a

25      document is laid.  It has to be actually laid first and then

1    the witness, it can be offered, I may or may not object to it

2    and then it can be read from.  I don't know what the purpose of

3    this document is.  It appears to be four pages of, quite

4    frankly, nonsense e-mails that I'm not sure are particularly

5    relevant in the first place.  I'm fairly certain it's outside

6    the scope of cross.  I would like to have the opportunity to

7    make my objection.

8              THE COURT:  What is the question that you asked?

9    What's on the piece of paper, or did you ask, is this an

10   e-mail?  What is this document?  What did you ask?

11             MR. NOHAVICKA:  I can't remember, but I'll ask what

12   the document is.  Just as an offer of proof, he mentioned Gita

13   and the foundation group and what she did.  This e-mail is

14   going to show that she did quite a bit.

15             MR. O'DONOGHUE:  The witness already testified about

16   Gita and what she did.  I'm not sure what this adds to that

17   conversation.

18             MR. NOHAVICKA:  It is not going to the proof.

19             THE COURT:  Back and forth.  I asked a question of Mr.

20   O'Donoghue.  I heard what he had to say in terms of a response.

21   Thank you very much.

22             (Continued on next page)

23

24

25

```
 1                    (In open court)

 2              MR. NOHAVICKA:  Your Honor, may I proceed.

 3              THE COURT:  You may.

 4   BY MR. NOHAVICKA:

 5   Q.  Jesseca, I've handed you and made you pick out pages 104,

 6   105, and 106 of Plaintiff's Exhibit 9 for identification.  Can

 7   you tell the jury what this document is, without saying what's

 8   contained in the document?

 9   A.  The subject is social media ideas.

10              THE COURT:  Do you understand?  You are not supposed

11   to read from the document.  What is it?  Are you looking at a

12   matchbook cover?  Are you looking at a page of a comic book?

13   What is the document?

14              THE WITNESS:  It's an e-mail.

15              THE COURT:  Thank you.  Next question.

16   Q.  Have you ever seen this document before?

17   A.  Yes.

18   Q.  And in what form have you seen it?  In an e-mail?

19   A.  In an e-mail, yes.

20   Q.  Is this an e-mail that you received?

21   A.  Received and sent.

22   Q.  And how is it that you know that you received this by

23   e-mail?  Is your e-mail address on there?

24   A.  Yes.

25   Q.  And do you know who the people are who sent you these
```

1    documents?

2    A.   Yes.

3    Q.   How do you know that?  Does it have their e-mail address on

4    it?

5              MR. O'DONOGHUE:  Objection to leading, your Honor.

6              THE COURT:  Overruled.

7    A.   Yes.

8    Q.   And the person that you received it from, had you received

9    e-mails from that person on prior occasions?

10   A.   Often, yes.

11   Q.   And that was their correct e-mail address?

12   A.   Yes.

13   Q.   And you were able to respond to them as well?

14   A.   Yes.

15             MR. NOHAVICKA:  Your Honor, at this time I will offer

16   into evidence Plaintiff's Exhibit 9, pages 104 through 106 as

17   Plaintiff's Exhibit 9.

18             MR. O'DONOGHUE:  Objection.  Improper foundation and

19   I'd like a voir dire.

20             THE COURT:  Overruled.  Received.

21             (Plaintiff's Exhibit 9 received in evidence)

22             MR. NOHAVICKA:  Permission to publish.

23             THE COURT:  You may.

24   Q.   You see it on your screen?

25   A.   Not yet.

1  Q.  Just look at your document, the first page.  And on the

2  second transmission, July 19, 2012, you see that?

3  A.  Yes.

4  Q.  And that's something that you sent to Gita, right?

5  A.  Yes.

6  Q.  And why were you writing to her?

7  A.  I wanted to get her feedback, as well as share my ideas

8  with her and the rest of the group.

9  Q.  And ideas pertaining to what, Jesseca?

10  A.  To our social media strategy for Glaze Teriyaki.

11  Q.  And did you lay out the strategy in the e-mail itself?

12  A.  I did, yes.

13  Q.  And does the strategy start at the beginning after you say,

14  hope these all make sense in any way at the bottom of the 0104?

15  A.  Yes.

16          MR. O'DONOGHUE:  Objection.  Leading questions.

17          THE COURT:  Try to refrain from leading.

18          MR. NOHAVICKA:  Yes, your Honor.

19  Q.  Where does your strategy begin on Plaintiff's Exhibit 9?

20  A.  After it says, hope these make sense or help in any way.

21  Q.  And does it continue on to the next page?

22  A.  Yes.

23  Q.  And is that a continuation of your strategy?

24  A.  Yes.

25  Q.  And does it continue on throughout the bottom of the page?

G4BMNAL3                        Naldo - redirect

1    A.   Yes.

2    Q.   And then you signed off at the bottom of 105, correct?

3    A.   Yes, that's me.

4    Q.   And then looking at 106, there is two e-mails.  One from

5    Paul Krug, is that right?  You see that in the middle, July 19

6    at 9:38 a.m.?

7    A.   Yes.

8    Q.   How does he respond to your suggestions?

9    A.   Good job.

10   Q.   And you get a response from Gita McCutcheon, also?

11             MR. O'DONOGHUE:  Objection.  The documents speak for

12   themselves.

13             MR. NOHAVICKA:  The documents do not speak, your

14   Honor.

15             THE COURT:  I am going to allow the question.  The

16   documents may very well speak for themselves and documents do

17   speak.  However, I am going to allow the question.  Go ahead.

18   Q.   How does Gita respond to your suggestions?

19   A.   This is really great, Jesseca.  Let's talk through this and

20   Ian's ideas today.

21             THE COURT:  Ladies and gentlemen, you should be aware

22   that these exhibits are not received for the truth of their

23   contents but the fact that they were sent back and forth.

24   That's the only reason for which they are received into

25   evidence.

1              Go ahead.

2   Q.  And you testified on cross-examination that the e-mail was

3   the only document, written document that you had where you were

4   requesting payment?

5   A.  Yes.

6   Q.  Were there other e-mails in existence that you did not have

7   access to?

8              MR. O'DONOGHUE:  Objection.

9              THE COURT:  Basis.

10             MR. O'DONOGHUE:  Counsel is calling for speculation as

11  to any other documents that may have existed which he cannot

12  produce today.

13             THE COURT:  Rephrase your question.

14  Q.  Do you have personal knowledge of the existence of any

15  other written documents where you requested payment for your

16  work --

17             MR. O'DONOGHUE:  Objection.

18             THE COURT:  Basis.

19             MR. O'DONOGHUE:  Your Honor, we had full and fair

20  discovery in this matter.

21             THE COURT:  Stop it.  The basis for your objection.

22             MR. O'DONOGHUE:  The basis of my objection is renewed

23  as to the last time.  Counsel is asking --

24             THE COURT:  Overruled.

25             MR. O'DONOGHUE:  Asking about a hypothetical document

1    that may or may not have existed.

2         THE COURT:  Overruled.  It's a perfectly fine

3    question.  Overruled.

4    A.  Yes.

5    Q.  Excuse me.

6         MR. NOHAVICKA:  Counsel wanted to say something?

7         THE COURT:  Ask your next question.

8    Q.  The question was whether other documents existed.

9    A.  Yes.

10   Q.  But you do not have those documents, correct?

11   A.  Unfortunately, no.

12        MR. NOHAVICKA:  I have nothing further, your Honor.

13        THE COURT:  You may step down.

14        MR. O'DONOGHUE:  Your Honor, may I have a brief

15   recross, considering --

16        THE COURT:  The exercise of discretion, ladies and

17   gentlemen.  Usually what the order in a trial is, there is the

18   direct examination, then there is a cross, and then there is a

19   redirect by the party who called the witness.  The Court has

20   the discretion to allow a brief recross-examination, but that's

21   a discretionary matter.  Here I am going to allow Mr.

22   O'Donoghue to do that.

23        MR. O'DONOGHUE:  Thank you, your Honor.  Just

24   because --

25        THE COURT:  I don't need commentary.  Just ask the

C4BMNAL3                       Naldo - recross

1     question.

2     RECROSS EXAMINATION

3     BY MR. O'DONOGHUE:

4     Q.  Ms. Naldo, you don't have any other proof of these

5     documents existing, do you?

6     A.  Can you clarify these documents.

7     Q.  Your attorney asked you if you knew of any other documents

8     that may exist that may have said that you asked for

9     compensation on more than one occasion, right?

10    A.  Yes.

11    Q.  You don't have those documents, right?

12    A.  Those e-mails are gone.

13    Q.  And the e-mail that you were shown the chain, from Gita and

14    you, do you know if any of those were ever implemented?

15    A.  I'm sorry?

16    Q.  You had a bunch of suggestions and this would be great and

17    this would be great and Foursquare this and Twitter that, were

18    any of those actually implemented, to your knowledge?

19    A.  Some were, yes.

20    Q.  Do you have any proof of that?

21    A.  I am not sure.

22    Q.  It's a yes or no question.  Do you have any proof?

23    A.  Proof that I implemented?

24    Q.  Proof that they were used, yes.

25    A.  Used, but not with my name, no.

1   Q.   The question is, do you have any proof that shows that

2   anything you suggested in those e-mails was implemented that

3   you can show us?  It's yes or no.

4           THE COURT:  Can you answer the question.

5   A.   No.

6           MR. O'DONOGHUE:  Thank you.

7           THE COURT:  You may step down.

8           (Witness excused)

9           THE COURT:  Call your next witness.

10          MR. NOHAVICKA:  We have no further witnesses, your

11  Honor.

12          THE COURT:  Plaintiff rests.

13          MR. NOHAVICKA:  Yes, we do.

14          THE COURT:  Mr. O'Donoghue, call your first witness.

15          MR. O'DONOGHUE:  Your Honor, at this time we request a

16  side bar.  We have something to take up with the Court

17  regarding a motion.

18          THE COURT:  Ladies and gentlemen, you can stand up and

19  stretch.

20          (Continued on next page)

21

22

23

24

25

1                (At the side bar)

2                MR. O'DONOGHUE:  Clearly this is a ripe case for a

3     Rule 50 motion for judgment as a matter of law.  There has been

4     absolutely no evidence, documentary or otherwise, submitted by

5     the plaintiff to indicate that this person legally was an

6     employee of this company.

7                THE COURT:  The motion is denied.  A case can be

8     established from the mouth of the plaintiff.  The plaintiff's

9     testimony is proof, if believed by the jury.  Motion denied.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (In open court)

2                   MR. O'DONOGHUE:  The defendants call Mr. Paul Krug.

3                   THE COURT:  Come on up, Mr. Krug.

4        PAUL KRUG,

5             a Defendant, called as a witness on his own behalf,

6             having been duly sworn, testified as follows:

7        DIRECT EXAMINATION

8        BY MR. O'DONOGHUE:

9        Q.  Good afternoon, Mr. Krug.

10                  You are the owner and operator of Glaze Teriyaki LLC,

11       is that correct?

12       A.  Managing member, yes.

13       Q.  And what is Glaze Teriyaki?

14       A.  It's a fast, casual, healthy Japanese restaurant.

15       Q.  How many members are in Glaze Teriyaki, LLC?

16       A.  Including -- in the entity level?

17       Q.  Total.

18       A.  Probably 15.

19                  (Continued on next page)

20

21

22

23

24

25

1   BY MR. O'DONOGHUE:

2   Q.   And did you come to know the plaintiff Jessica Naldo at

3   some point?

4   A.   Yes.

5   Q.   How?

6   A.   I was in the basement one day early on when we opened the

7   first location at Lexington, and a cashier I believe came down

8   and told me that there was someone, a customer, that introduced

9   herself as someone from Seattle and excited about the food we

10  were selling and what we were doing.  I'm from Seattle also,

11  and there are Seattleites across the country here and thought

12  it would be nice to go up and say hi and hope she had a good

13  time.

14  Q.   Did there come a time where the plaintiff began to work

15  with or at Glaze Teriyaki?

16  A.   Yes.

17  Q.   When was that?

18  A.   Early 2012.

19  Q.   And what did she do?

20  A.   I would consider her an internship.  There would be a

21  variety of different things that she would do.  I typically,

22  with whether it's with a potential intern or another member of

23  the company, like to start things what do you want to do out of

24  this, and see if there's -- make sure it's a win/win situation

25  and see how best we can make things work for everybody

 1   involved.  And so with Jessica we started with -- I wanted to

 2   hear what she might want to do with us and see if that could

 3   make sense on our end and proceed from there.

 4   Q.  Before Ms. Naldo, did you ever have an intern at Glaze

 5   Teriyaki?

 6   A.  No.

 7   Q.  Have you had one since?

 8   A.  No, we did have one intern.

 9   Q.  Before or after?

10   A.  Briefly, before.

11   Q.  Did that intern receive college credit?

12   A.  Yes, I believe so.

13   Q.  Ms. Naldo said before that she -- you heard her testimony,

14   today, correct?

15   A.  Yes.

16   Q.  She said before she was your integrated marketing and brand

17   manager, is that accurate?

18   A.  We have never given a title like that out, and have

19   essentially farmed out all branding and marketing activities to

20   third-party professional companies in the city since the

21   beginning.

22   Q.  Is that Project 13 and Gita McCutcheon?

23   A.  Yes, at this time, the time in question, yes.

24   Q.  Before Ms. Naldo, who did the marketing and branding

25   strategy for the company?

1   A.  I would in conjunction with the professional third-party

2   companies, Gita Group and Project 13.

3   Q.  How essential, if at all, was Ms. Naldo to your operation?

4   A.  Not essential.

5   Q.  And if you recall, in the first five or six months from

6   February 2012 until say the end of the summer of that year, how

7   many hours did she work with you?

8   A.  I don't recall exactly.  I would have to say around ten

9   hours a week, maybe, maybe.

10  Q.  Would she come in in the morning or would she come in in

11  the afternoon?

12  A.  It would really depend.  Her schedule would fluctuate.  We

13  did our best to try to accommodate.  At the time I was told she

14  was a senior and graduating in the spring, it was the second

15  semester of the senior year of college.  She was from the same

16  hometown.  And I would allow her to -- not allow, but the

17  priority in my mind was here's a senior in college in the last

18  little bit, and however it can be a complementary experience

19  for her.

20  Q.  Would you have done that with any of your other employees?

21       MR. NOHAVICKA:  Objection, speculation.

22  Q.  Withdrawn.  Did you then or do you now do that with any of

23  your restaurant employees?

24  A.  No.

25  Q.  Are all your restaurant employees paid?

1   A.   Yes.

2   Q.   Do they clock in and clock out on a regular basis?

3   A.   Yes.

4   Q.   Is there anyone other than you in the company that does not

5   clock in or clock out on a regular basis?

6   A.   My business partner, Dennis Lake.

7   Q.   The gentleman seated at the table?

8   A.   Yes.

9   Q.   Did you ever compensate Ms. Naldo for anything she did for

10  the company?

11  A.   Yes.

12  Q.   What sort of things was she compensated for?

13  A.   Her compensation would come in a variety of ways.  We were

14  at the time one small 625-square-foot restaurant on Lexington

15  between 54th and 55th paying enormous rent and doing our best

16  to, one, survive and hopefully lay the foundation to grow as a

17  company.  And so depending on the week or what was going on at

18  that time, whether it was lunch or Metrocards or concert

19  tickets or a check or different things, and this was all

20  explicitly discussed in advance with Ms. Naldo.

21  Q.   And in 2012, what sort of tasks did she perform for the

22  company?

23  A.   Well, my understanding is that she was excited about our

24  concept and what we were doing.  It was mentioned earlier that

25  in Seattle, where I grew up, there are a lot of Teriyaki shops

G4BTNA1t                             Keung - direct

1    which don't really exist around in New York.  And she expressed

2    an interest in being involved in it and seeing how that works

3    and how a start-up new restaurant concept might work and what

4    goes on day to day, and expressed an interest in learning a

5    variety of parts of the company, which we tried to sprinkle

6    around through myself or through my partner Dennis, who is the

7    chef and another co-operator with me.

8    Q.  Did her duties or roles change between after 2012 into 2013

9    or into 2014?

10   A.  Well, my understanding was that she was going to be

11   graduating in spring of -- I believe it's '12 was her senior

12   year, second semester, and that did not happen.  And she was --

13   the entire time I have known her, interacted with her was as a

14   full-time student is what I was told.  So there isn't -- it

15   became clear with the actions and the week-to-week performance

16   or non-performance that there couldn't be much on the plate

17   that we could, one, rely upon or expect to get done given other

18   things going on in her life.

19   Q.  You're saying she wasn't reliable?

20   A.  Correct.

21   Q.  Did she have a set schedule of any kind?

22   A.  No.

23   Q.  Why?

24   A.  We were, still are, a small company.  It became -- early on

25   it was very clear to myself and to my partner Dennis that we

1  could not rely on her to do anything that we really needed done

2  in a certain time period.  And so that in and of itself kind of

3  prevents us from putting together a schedule or wanting her to

4  be involved in that capacity, because we were getting burned

5  during her first few months from erratic behavior, tardiness,

6  flakiness, not showing up, not completing tasks.  It became

7  more work to try and do it with her than to just do it on our

8  own.

9  Q.  Is that why you went to a flexible working schedule?

10  A.  Well, at different times I was told that she had a

11  different number of classes or some summer breaks or certain

12  nights or days or weekends that she's able to do things.  And

13  so in an attempt to accommodate, we would adjust things, yes.

14  Q.  If you recall, what sort of things would she do when she

15  was able to come into the restaurant?

16  A.  Well, one of the things that really we started out with was

17  on the social media side of things.  Social media was not

18  something that we spent a lot of time, energy or money on, as

19  we, several years later now as we have gone to become a little

20  bit of a bigger company, we now have more of a focus on it as

21  we look to expand.  But at the time it was a very minor part of

22  what we do, and there would typically consist of three mediums

23  online, our Facebook, Twitter, and Instagram -- I'm not sure

24  back then if Instagram was -- suffice to say there were three

25  platforms, and we would do periodic updates on them weekly.

1          A pet peeve of mine as an operator is when things like

2   social media that are not integral parts of what we're doing

3   start and get herky jerky, so you do five -- a lot of attention

4   to it one week and then a drop off for three weeks and it picks

5   up again.  So we set up a schedule that we felt like as a

6   company with we could live up to and that Jessica could live up

7   to, and that required very minimal postings online in a minimal

8   amount so it looked like a consistent effort.

9   Q.  Was that done?

10  A.  Yes, with great teamwork and communication and guidance,

11  yes.

12  Q.  How many employees does Glaze Teriyaki have, Glaze Teriyaki

13  LLC have?

14  A.  Around 15.

15  Q.  Are all of those employees paid?

16  A.  Correct.

17  Q.  How are they paid?

18  A.  Via ADP.

19  Q.  So for any employee, if you needed to pull up their working

20  hours or their pay rates, you can do that through ADP?

21  A.  Yes.

22  Q.  Why can't we do that with Ms. Naldo?

23  A.  One, we never hired her as an employee.  We liked her as a

24  person, we hoped -- the hope was that in the winter of '12 when

25  we started this was that she would graduate and the hope was

1    that it could potentially turn into a job, which it became

2    clear during her internship she was not ready to be a full-time

3    member of our company.

4    Q.  And so how many hours a week -- after the internship

5    period, how many hours a week do you think she worked in 2012,

6    2013, 2014?

7    A.  There would be stretches where there would be no work.

8    There would be some stretches where it might be -- the truth is

9    I don't know because much of what she claimed she was working

10   on or doing, that would typically not amount to anything or

11   finish in a usable state for us, was really done in an office.

12   We didn't have an office, we had very small footprint in the

13   city, and a lot of it was supposedly done at her apartment or

14   away from us where we didn't know.

15   Q.  Do you know if Ms. Naldo traveled frequently during the

16   time she worked at Glaze?

17   A.  Absolutely.

18   Q.  Do you know how often?

19   A.  It's hard for me to say on an average basis, but it was

20   certainly -- I was envious of her social life and how much she

21   was able to do at night and around the country and elsewhere.

22           MR. NOHAVICKA:  Objection, move to strike, your Honor.

23           THE COURT:  Sustained.  Stricken, not responsive.

24   Q.  How did you follow where Ms. Naldo was if she wasn't in the

25   office?

1    A.  Oftentimes people -- I have worked in large, very big

2    restaurants or hospitality venues before, and also in very

3    small ones, like what Glaze is.  And everyone -- people often

4    times assume a bigger restaurant, it's harder.  I find that in

5    many ways the smaller you are the harder it gets, and that

6    there's very few people around and you really have to rely on

7    them, and sometimes the most important thing is just having

8    someone show up.  And for us at that stage we were such a small

9    company, it became clear we could not rely on her for this

10   stuff, and so anything critically important, things like that,

11   we just didn't put on the plate.

12   Q.  If she wasn't in the office, how did you communicate with

13   Ms. Naldo?

14   A.  I would say primarily via email.

15   Q.  Do you know -- did you have an opportunity to review your

16   email history before today with Ms. Naldo?

17   A.  Yes, I went through the inboxes.

18   Q.  Do you know approximately how many emails Ms. Naldo sent or

19   received in 2012?

20   A.  Maybe low hundreds, 200, 250, 300.

21   Q.  How about in 2013?

22   A.  Certainly less.  I feel like it was a steady sort of drop

23   down.

24   Q.  And 2014 were there any emails?

25   A.  Much more minimal than earlier.

C4BTNAL4                    Naldo - cross

1    Q.  Would it be fair to say that she worked a lot or more in

2    2012 and that decreased substantially over the time period that

3    she was working with you?

4    A.  I think that's fair to say, yes.

5            MR. O'DONOGHUE:  I have nothing further, thank you,

6    Judge.

7            THE COURT:  Cross-examination.

8    CROSS-EXAMINATION

9    BY MR. NOHAVICKA:

10   Q.  So your attorney asked and you adopted the question saying

11   that she was unreliable, is that accurate?

12           MR. O'DONOGHUE:  Objection to characterization of the

13   question.

14           THE COURT:  Overruled.

15   Q.  Is that accurate?

16   A.  Yes.

17   Q.  And you kept her for 30 months?

18   A.  She did --

19   Q.  Yes or no.

20           MR. O'DONOGHUE:  Objection.  Counsel is being

21   argumentative.

22           THE COURT:  Overruled.

23   Q.  You did not keep her for 30 months?

24   A.  We don't keep anyone --

25   Q.  Did you tell her to leave before the 30 months?

G4BTNAL4                          Naldo - cross

```
 1              THE COURT:  Let the witness answer the question.
 2    Don't jump on the answer.  Go ahead.
 3    Q.  Did you tell her to leave before the 30 months?
 4    A.  I felt like Jessica was a nice person and we were from the
 5    same hometown and she wanted experience and résumé builder
 6    work.  And we, in conjunction with the professional marketing
 7    public relations and branding groups that we work with that
 8    work with a variety of successful hospitality concepts in New
 9    York and elsewhere in this country, we fed little things that
10    she could work on, like a music play list for a restaurant, or
11    if she had an idea, to try to work on something.  We did our
12    best to try to help out with that, yes.
13    Q.  So unreliability in your organization is not accepted
14    unless they're from your hometown?
15              MR. O'DONOGHUE:  Objection.
16    Q.  Is that fair?
17              THE COURT:  That's argumentative.  Rephrase it.
18    Q.  You don't deny that, and you don't change your position
19    that she was unreliable, right?
20    A.  She was totally unreliable.
21    Q.  And have you ever let anyone at Glaze Teriyaki remain as
22    workers for a period of 30 months?
23    A.  This is why we never hired her.  She was never someone --
24    we didn't have that expectation level that we would have with
25    anyone else at the company because we never hired her for this
```

1   reason, amongst others.

2   Q.  You said that before she came you used to handle the

3   marketing yourself, right?

4   A.  I have --

5   Q.  And --

6   A.  I'm not done.

7            THE COURT:  Excuse me, he's not finished with the

8   answer.  Go ahead.

9   A.  The marketing, branding and public relations and everything

10  under that umbrella has been a primary focus of me to this day

11  from the start of this restaurant company, yes.

12  Q.  And then you outsourced it to Gita, is that right?

13  A.  That's incorrect.  From day one we have worked with a

14  public relations company, we worked with graphic designers, we

15  worked with branding companies and a variety of marking people

16  and companies throughout the five and a half years that we have

17  been open.  So it's not outsourcing for me.  I quarterback that

18  effort and work in conjunction with many people and companies.

19  Q.  And this is for your company that you described as a small

20  company, right?

21  A.  Yes.

22  Q.  And a small company that has a restaurant in New York City,

23  right?

24  A.  Currently.

25  Q.  And a small restaurant in San Francisco as well, right?

1    A.   I was going to say something.   Currently we have three

2    locations in New York City.   We have two that we received a

3    licensing fee from in San Francisco that we don't operate day

4    to day, and we recently opened one in Chicago.

5    Q.   Okay.   And when your counsel asked you how many hours she

6    worked, that was from some sort of employee record book you

7    have?

8                MR. O'DONOGHUE:   Objection.

9                THE COURT:   Rephrase it, if you will, please.

10   Q.   You testified as to how many hours Jessica Naldo worked, is

11   that correct?

12   A.   I have no way of knowing how many hours she actually worked

13   at any moment in time because she claimed she did a lot of work

14   outside of my presence, and most often it resulted in nothing

15   tangible, so I have no idea if it was done or not.

16   Q.   I'm sorry, because I thought I heard you say 250, 300.   Do

17   you remember testifying to that?

18                MR. O'DONOGHUE:   Objection.

19   Q.   That might be wrong.

20                MR. O'DONOGHUE:   Objection.   What counsel heard is not

21   relevant.

22   Q.   Is that what your testimony was.

23                MR. O'DONOGHUE:   Objection to the form of the

24   question.

25                THE COURT:   Overruled.

1   A.  What does 250 or 300 reference to?

2   Q.  You were asked how many hours.

3           THE COURT:  No, it was an answer about emails.

4           MR. NOHAVICKA:  Sorry, emails, that's right.

5   Q.  You have no idea -- withdrawn.

6           You don't know exactly how many hours Jessica worked,

7   is that fair to say?

8   A.  We certainly attempted on multiple times to have Jessica

9   fill out a form where she told us what hours she worked, and

10  she never did.  I cannot discern how many hours someone worked

11  for Glaze based on how many emails I received.  Certainly if I

12  feel like one year I received several hundred and another year

13  I received half of that, I could theorize that maybe there was

14  less work going on.  But I don't know, based on her mail count,

15  how many hours a week she was doing.  I just don't know.  We

16  tried to find out, but she would never give it to us.  She

17  would never do it.

18  Q.  So it was her protracted silence that was the reason for

19  her not giving you the forms that you needed, the W-2, the

20  1099?

21          MR. O'DONOGHUE:  Objection.  Mischaracterizes the

22  testimony.

23          THE COURT:  Overruled.

24  A.  We gave Ms. Naldo -- my partner, Dennis Lake, gave

25  Ms. Naldo forms like that at one point, asked her to fill them

1  out, give them back to us like everyone else at the company

2  because she was receiving some compensation, and she never did.

3  Q.  But you didn't fire her after that, did you?

4  A.  I don't think -- well, first of all, she never had an

5  important role or I guess a fireable role for us.  To this day

6  I believe she's a nice person.  Again, we're from the same

7  town.  I met her parents.  While she's in year five, six, or

8  however many years of college and she wants to help us out and

9  learn from what we're doing, we wanted to be a helpful resource

10  for her, if possible.  And the way we made that work for both

11  sides was she would work on very, I guess, non-essential

12  day-to-day operations.  There was nothing that we relied upon

13  her for.

14        THE COURT:  Try to avoid the "we."

15  A.  Nothing that I relied on her for.  My expectation was that,

16  if not all, most of what she might say she wants to do or

17  propose to do or might discuss her doing would never get done.

18  Q.  She was working directly with Gita, was she not?

19  A.  She wasn't working directly with Gita, she was involved in

20  the process as a way for her to learn about this process and

21  how it goes.

22  Q.  And her work was in fact approved by your company, was it

23  not, as we saw in the exhibit put into evidence?

24        MR. O'DONOGHUE:  Objection.  What exhibit are we

25  talking about?

```
 1              MR. NOHAVICKA:  Exhibit 9, 104, 105, 106.

 2              MR. O'DONOGHUE:  Objection.  Mischaracterization of

 3   what is in evidence.

 4              THE COURT:  Overruled.

 5   Q.  Did you disapprove of her work that she did?

 6   A.  I haven't read the email that you're referring to.

 7   Q.  We'll get it for you.

 8              MR. NOHAVICKA:  Your Honor, to save time, could I hand

 9   it up?

10              THE COURT:  You may.  Identify what you are showing

11   the witness.

12              MR. NOHAVICKA:  If the record could please reflect I'm

13   showing the witness a hard copy of Plaintiff's Exhibit 9, Naldo

14   Bates stamp 104, 105 and 106.

15              THE COURT:  Okay.

16   A.  Well, as I'm looking at this, her --

17   Q.  My question to you is:  Did you approve of her work?

18   A.  I was attempting to answer.

19              MR. O'DONOGHUE:  Objection.

20              THE COURT:  I don't think that's the way the question

21   came out originally.  You're withdrawing your prior questions?

22              MR. NOHAVICKA:  Withdrawing all prior questions.

23              THE COURT:  There's no question pending before you.

24   Do you understand that?

25              THE WITNESS:  Okay.
```

G4BTNAL4                        Naldo - cross

 1            THE COURT:  Ask your question.

 2   BY MR. NOHAVICKA:

 3   Q.  Did you have a chance to review the emails that are now in

 4   evidence as Plaintiff's 9, 104, 105 and 106?

 5   A.  Referring to this?

 6            THE COURT:  Yes.

 7   A.  I'm looking at it now.

 8   Q.  Yes, the document I just handed to you.

 9   A.  Well, this seems to be breaking out -- there's -- it looks

10   like to me about four or five core ideas here, and the first --

11            THE COURT:  No, the question is -- I think the

12   question was:  Did you have a chance to look at the document?

13            THE WITNESS:  Yes, I did.

14            THE COURT:  That's the question so far.  Now there's

15   he going to be another question, I have a feeling, that follows

16   it.

17   Q.  Are you part of that email chain?

18   A.  Yes.

19   Q.  And you responded yourself in that email chain, is that

20   right?

21   A.  Yes.

22   Q.  And your response was:  Good job.  Is that close?

23   A.  Yes.

24   Q.  And that was about what Jessica had done for your company?

25   A.  But --

1    Q.   Is that right or wrong?

2    A.   But I guess the standard with Jessica might have been it

3    might have been a good job that she took the time to even type

4    something up that she said she would, or that sort of thing.

5    And as a restaurant operator, I get advice or ideas or thoughts

6    about good ways to market or menu ideas or any number of

7    construction ideas from a variety of friends and family and

8    people around me throughout, and I think it's wonderful when

9    people offer that up and it's wonderful that Jessica put this

10   in.  Whether it was actually done by her, as I look at this,

11   none of this was actually --

12           MR. NOHAVICKA:  Objection, your Honor, I don't have a

13   question on this.

14           THE COURT:  Thank you.  You can ask your next

15   question.

16   Q.   In addition to the marketing that she did for you -- she

17   did some marketing for you, is that right?

18   A.   Yes, very minimal.

19   Q.   In addition to that, didn't she handle big collections as

20   well?

21   A.   Not in a material way that I'm aware of.

22   Q.   Like contacting, for example, Comentum, are you familiar

23   with that company?

24   A.   Comentum.  I don't recall the name.

25   Q.   Or perhaps going to the store to pick up thank you letters

```
 1   for you?
 2   A.  That certainly could have occurred.
 3            MR. NOHAVICKA:  I have nothing further.
 4            THE COURT:  Any redirect?
 5            MR. O'DONOGHUE:  No, your Honor, thank you.
 6            THE COURT:  Okay.  You may step down.
 7            You can call your next witness.
 8            MR. O'DONOGHUE:  Thank you, Judge.  Could I have one
 9   moment, please, to speak to the other defendant before I call
10   him?
11            THE COURT:  Yes.
12            (Pause)
13            MR. O'DONOGHUE:  Your Honor, after conferring with my
14   clients, we decided the defense rests at this time.
15            THE COURT:  All right.  Is there any rebuttal case
16   from the plaintiffs?
17            MR. NOHAVICKA:  Nothing, your Honor.
18            THE COURT:  So ladies and gentlemen, that concludes
19   the evidentiary portion of this case, it does not conclude the
20   trial.  I feel like we have known each other forever, even
21   though it was only since this morning.  But now what happens is
22   tomorrow each side will have the opportunity to briefly sum up
23   and tell you what they think the evidence shows, and then I
24   will give my final instructions on the law.
25            From the plaintiff, how long do you need?
```

1          MS. PANAGOPOULOU:  Approximately five to ten minutes.

2          THE COURT:  All right.  And from the defendant?

3          MR. O'DONOGHUE:  I think that same time frame would be

4     sufficient.

5          THE COURT:  So you will have the case in hand

6     tomorrow, and so what I'm going to ask you to do is go home,

7     have a pleasant evening, and I will see you back here

8     10 o'clock tomorrow morning.

9          Now remember what I told you, do not discuss the case

10    among yourselves or with anyone.  Do not endeavor to do your

11    own research.  You're not allowed to do it.  It's unfair to one

12    side or the other to try and do that.  So please, follow that

13    instruction that I give you, and have a great evening.  I will

14    see you tomorrow morning at 10 o'clock.

15          (Jury not present)

16          THE COURT:  Please be seated.

17          For the record, this morning before the voir dire

18    process began I had marked as Court Exhibit 1 an aid to memory

19    used in questioning the jurors, Court Exhibit 2, a special

20    verdict sheet, and Court Exhibit 3, proposed jury instructions.

21          I know Mr. O'Donoghue's offices down here are in lower

22    Manhattan, and I believe plaintiff's counsel's office is in

23    Astoria, is that correct?

24          MR. NOHAVICKA:  Yes, your Honor.

25          THE COURT:  So what I am going to ask you to do is, if

1   you have any comments on the jury instructions or on the

2   verdict sheet, first of all, please look at them, and I am

3   going to have my law clerk give you his email and they should

4   be transmitted no later than 8:30 tonight.  And then we'll be

5   ready to go in the morning, we'll briefly discuss the

6   instructions.  I ask you all to get here at 9:15 and we'll take

7   that up and proceed.

8           So have a good evening, and I will see you tomorrow

9   morning.

10          MR. NOHAVICKA:  Thank you, your Honor.

11          MR. O'DONOGHUE:  Thank you, your Honor.

12          (Adjourned to April 12, 2016 at 9:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JESSECA NALDO

Direct By Mr. Nohavicka  . . . . . . . . . . .15

Cross By Mr. O'Donoghue  . . . . . . . . . . .68

Redirect By Mr. Nohavicka  . . . . . . . . . .93

Recross By Mr. O'Donoghue  . . . . . . . . . 106

PAUL KRUG

Direct By Mr. O'Donoghue . . . . . . . . . . 109

Cross By Mr. Nohavicka . . . . . . . . . . . 119

PLAINTIFF EXHIBITS

Exhibit No.                                     Received

  2   . . . . . . . . . . . . . . . . . . . .49

  3   . . . . . . . . . . . . . . . . . . . .53

  6   . . . . . . . . . . . . . . . . . . . .66

  9   . . . . . . . . . . . . . . . . . . . 101